# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-07-00539-CV

---

**Etan Industries, Inc. and Etan Industries, Inc. d/b/a CMA Cablevision and/or CMA Communications, Appellant**

**v.**

**Ronald Lehmann and Dana Lehmann, Appellees**

---

### FROM THE DISTRICT COURT OF LEE COUNTY, 21ST JUDICIAL DISTRICT
### NO. 13,010, HONORABLE TERRY L. FLENNIKEN, JUDGE PRESIDING

---

## O P I N I O N

This appeal from a judgment following a jury trial arises from a dispute between appellant Etan Industries, Inc. and Etan Industries, Inc., d/b/a CMA Cablevision and/or CMA Communications ("Etan") over its authority to install, own, and operate fiber optic and coaxial cable lines on land owned by appellees Ronald and Dana Lehmann without the Lehmanns' permission. The jury found that (i) Etan trespassed and made a negligent misrepresentation concerning one of two properties, (ii) $15,000 would reasonably compensate the Lehmanns for their damages that resulted from Etan's actions, and (iii) the Lehmanns' reasonable attorney's fees through trial were $65,000. The district court entered judgment in accordance with the jury's findings. In seven issues, Etan challenges the district court's award of injunctive and declaratory relief, damages, and attorney's fees, and contends that the Lehmanns' tort claims of trespass and negligent

misrepresentation are barred as a matter of law based upon limitations. For the reasons that follow, we affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Controversy*

In 1986, the Lehmanns acquired property in Lee County, Texas, which is located on Highway 77 south of Giddings (the "Hwy 77 Property"). At that time and continuing through the time of trial, Bluebonnet Electric Cooperative, Inc. ("Bluebonnet") owned and operated an electric transmission line on the Hwy 77 Property. Bluebonnet had obtained an easement from one of the Lehmanns' predecessors in interest to install and maintain an "electric transmission line or distribution line or system" on the property. Ronald Lehmann's brother, Steven Lehmann, also owned property located on Highway 77 south of Giddings, and Bluebonnet had a similar easement on his property.[1]

Etan operates cable television and internet systems. Etan and its predecessors in interest[2] either bought preexisting lines or built them to operate its systems. Etan and its predecessors entered into pole attachment agreements with electric cooperatives, including Bluebonnet, that authorized them to attach their lines to the cooperatives' poles. In 2000, Etan and Bluebonnet entered into an amendment to their operative pole attachment agreement, that provided for a "joint project to design, construct, and maintain a fiber optic cable facility" utilizing

---

[1] We refer to Ronald and Dana Lehmann as the Lehmanns, Ronald Lehmann as Ronald, and Steven Lehmann as Steven.

[2] Etan's predecessors in interest included Television Cable Company, Insight Communications Company, L.P., and Cencom Partner, L.P. d/b/a Crown Cable.

2

Bluebonnet's poles along Highway 77. The amendment contemplated a fiber optic line that would attach to 125 Bluebonnet poles.[3] Etan thereafter attached the fiber optic line to Bluebonnet's poles along Highway 77 and began operating the line.

Steven observed the line attached to Bluebonnet's poles on the day that Etan installed it across his property. He observed that the line crossed both his property and the Hwy 77 Property and that his property had been damaged. Ronald and Steven discussed the installation of the line that day, and they agreed that Steven would contact Bluebonnet about it. Steven did so the following day. Bluebonnet referred him to Etan. Steven then contacted Etan and spoke with its employee, Jerry Smith. At that time, Smith told Steven that Etan had an easement for the line. Steven requested a copy of the easement, and Smith said that he would send a copy to him. After some time passed without receiving a copy, Steven contacted Smith again, and Smith told him that "they'd just been having trouble finding it" but that he would send one to him. Steven contacted Smith a third time in the summer of 2001. This time Smith told Steven that he was "mistaken" that Etan had an easement. Smith told him that Bluebonnet and Etan were "in partnership" concerning the line and that Etan had Bluebonnet's permission to use Bluebonnet's easement. Steven kept his brother informed of his communications with Etan and Bluebonnet, and, upon being advised that Etan had Bluebonnet's permission to use Bluebonnet's easement, Steven and Ronald decided not to pursue the matter further.

---

[3] The fiber optic cable had 24 strands. The amendment provided that Etan would construct the line, the parties would split the cost of construction, and Bluebonnet and Etan would both own 12 of the 24 strands. The evidence at trial was that, although invoiced for half of the cost of the line in 2004, Bluebonnet did not pay for or have access to the line at any time.

3

In December 2002, Ronald heard about a Texas Supreme Court decision that cable companies could not use cooperative electrical easements for their cable lines.[4] The brothers again discussed Etan's line on their properties, deciding that Steven would contact Bluebonnet again. Steven did so, and a Bluebonnet employee, Jim Wolf, told Steven that Bluebonnet had agreed to allow Etan to attach its lines to Bluebonnet's poles but that Etan had to obtain its own easements and rights-of-way. Wolf told Steven that Wolf would contact Etan and that Etan would probably be in contact. During the time that they were waiting to hear back, Ronald searched the official records of Lee County for easements that Bluebonnet or Etan had obtained on their properties and found nothing.

In the middle of 2003, the Lehmanns and Steven had not heard anything further from Bluebonnet or Etan, and they hired an attorney. Their attorney contacted Bluebonnet and requested copies of easements and other documents concerning the properties. Around July 2004, Bluebonnet provided copies of its easements that authorized it to place, construct, and operate electric transmission or distribution lines on the properties. Bluebonnet also provided the Lehmanns with copies of pole attachment agreements between Bluebonnet and Etan and Etan's predecessors. The pole attachment agreements authorized Etan to attach its lines to Bluebonnet's poles for a fee, authorized Bluebonnet to remove any unauthorized attachments from its poles at Etan's expense and charge a penalty for unauthorized attachments, and provided that each party was responsible for obtaining its own easements and rights-of-way.

---

[4] *See Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697 (Tex. 2002) ("*Krohn I*"). Ronald testified that he "found out" about the case from the media, but he did not read the opinion or know how to get a copy of the opinion at the time.

In 2003, the Lehmanns acquired additional property on Highway 290 west of Giddings (the "Hwy 290 Property"). At that time, Etan owned and operated a coaxial cable line attached to Bluebonnet's poles that crossed this property.[5] Ronald contacted Jerry Smith in April 2005 concerning this line, and Smith told him that he "did not have a copy of any easement that was granted that far back." Ronald then contacted Bluebonnet, and Bluebonnet subsequently provided documents concerning the Hwy 290 Property. Etan did not have an easement on the Hwy 290 Property, and Etan's pole attachment agreement with Bluebonnet provided that each party was to obtain its own easements and rights-of-way.

### Litigation Commenced

Steven brought suit against Etan for trespass in December 2004 concerning Etan's fiber optic line that crossed his property and sought injunctive relief for the removal of the line on his property. Etan thereafter constructed and activated an alternative line and deactivated the line that crossed Steven's property and the Hwy 77 Property in February 2005. Etan also removed the portion of the line that was on Steven's property at that time, but it did not remove the portion of the line that was on the Hwy 77 Property. Steven ultimately settled his suit with Etan in September 2005.

In October 2005, the Lehmanns brought suit against Etan for claims concerning Etan's coaxial cable line crossing the Hwy 290 Property and, in February 2006, Etan removed its line from that property after installing an alternative line. In April 2006, the Lehmanns amended their

---

[5] Etan operated the coaxial cable line to provide cable television service to apartments. The line was built in 1984 by one of Etan's predecessors and conveyed to Etan in 1999.

petition to include claims concerning Etan's fiber optic line crossing the Hwy 77 Property. The Lehmanns' causes of action included trespass, negligence, gross negligence, and negligent misrepresentation, and they sought damages, attorney's fees, and declaratory and injunctive relief.[6] The Lehmanns' trespass claim included Etan's operation of its lines—the transmission of signals—across the Lehmanns' properties. Etan's affirmative defenses included that the Lehmanns' tort claims were barred because they were not filed within the applicable statute of limitations periods. The Lehmanns pleaded in response, among their defenses to limitations, that the discovery rule, the continuing tort doctrine, and Etan's fraudulent concealment of its wrongful conduct tolled the applicable limitations periods.

### The Trial

The jury trial occurred in June 2007. It was undisputed that Etan had removed the lines from the Hwy 77 Property and the Hwy 290 Property prior to trial.[7] The disputed facts included (i) whether Etan had trespassed on the Lehmanns' properties or made negligent misrepresentations concerning the properties, (ii) whether Etan's alleged actions damaged the Lehmanns, (iii) the date that the Lehmanns discovered or should have discovered their injury from Etan's alleged actions, and (iv) Etan's authority to install, own, and operate its lines on Bluebonnet's poles on the Lehmanns' respective properties. The Lehmanns contended that Etan's conduct was wrongful and

---

[6] Etan moved for partial summary judgment on the Lehmanns' declaratory claims. The district court granted Etan's motion prior to trial but set aside its ruling and reinstated the Lehmanns' declaratory claims during the trial.

[7] Etan attempted to remove the line on the Hwy 77 Property in March 2007, but a dispute arose between the parties at the property. Etan subsequently removed the line a few weeks before the trial.

6

caused them injury and that they discovered or should have discovered their injury in July 2004 when Bluebonnet provided copies of its easements and pole attachment agreements between Bluebonnet and Etan and its predecessors. Etan countered, among its defenses, that it had a prescriptive easement on the Hwy 290 Property because the line had been on the property for over 10 years and limitations barred the Lehmanns' tort claims as to the Hwy 77 Property because the Lehmanns were aware that Etan owned the line in December 2000.

The Lehmanns' witnesses included Ronald and Steven Lehmann and Jerry Smith. As to the Hwy 77 Property, Ronald and Steven testified to the discovery of Etan's line crossing their respective properties in December 2000; communications with each other, Bluebonnet, and Etan; their efforts to determine Etan's authority to install, own, and operate lines on their properties[8]; and their respective understandings of the *Krohn I* supreme court opinion. As to the Hwy 290 Property, Ronald testified to his discovery in late 2004 or early 2005 of Etan's line that crossed that property and his conversations with Smith concerning that line. Ronald also testified to the Lehmanns' alleged damages.[9]

---

[8] Ronald testified to the reason that he and his brother decided to get a lawyer involved:

We had a story from [Etan] that said one thing and we had a story supposedly that . . . Bluebonnet was going to contact [Etan] with another version of the story and those stories didn't meet. We couldn't find anything in the courthouse and we thought we weren't getting anywhere, we were going to have to seek an attorney to figure out how we were going to get the information that we needed to figure out who could allow them or how they could be allowed to be on the poles.

[9] Ronald testified that he bought and sold properties, including commercial and investment properties, and that he was familiar with real estate values in the area.

7

Smith's testimony was pivotal. He testified that he was employed from the 1980s in basically the same job and at the same office for Etan and all of its predecessors, except for Insight. He testified concerning (i) his communications with Steven, Ronald, and employees of Bluebonnet, (ii) the agreements between Etan and Bluebonnet including an oral agreement that he made with an employee of Bluebonnet, David Peterson, that authorized Etan to use Bluebonnet's easements on the Hwy 77 Property,[10] (iii) a similar oral agreement that he made with Gary Nietsche, the general manager of Fayette Electric Cooperative, for Etan to use Fayette's easements; (iv) cable companies' standard practice of using cooperatives' easements on private property for their lines without obtaining their own easements, (v) his understanding of *Krohn I*, and (vi) Etan's actions to address potential claims by private property owners for unauthorized lines. He testified that he had been involved in obtaining two easements with private property owners in all of his years in the business and that Etan had not addressed alleged unauthorized lines unless sued.

The Lehmanns also called Byron Wren, an employee of Bluebonnet; Gary Don Nietsche, the general manager of Fayette; William Weiser, a land surveyor who testified concerning a survey that he prepared for Etan in November 2006; and Max Roesch, the Lehmanns' attorney who testified concerning attorney's fees. Wren testified concerning his position at Bluebonnet as a right-of-way specialist, the relationship and agreements between Bluebonnet and Etan and its predecessors, and his communications with the Lehmanns' attorney, beginning in the middle of 2003. He testified that conducting the search to obtain the relevant documents was time consuming

---

[10] Peterson was not a witness at trial. He no longer worked for Bluebonnet but for a cooperative in Kerrville. Smith testified that Peterson denied the existence of any oral agreement with Smith.

and difficult and that he was unable to provide documents to the Lehmanns' attorney until July 2004.

Wren further testified to Bluebonnet's easements. He testified that they were for electric transmission or distribution lines, and not telecommunications easements. Copies of the easements and pole attachment agreements were admitted into evidence.[11] The pole attachment agreements included provisions requiring each party to obtain its own easements and rights-of way.

Wren also testified concerning the pole attachment agreements and the amendment to the operative pole attachment agreement between Etan and Bluebonnet concerning the Hwy 77 Property. It was his understanding that, although Bluebonnet and Etan agreed that Etan could attach and operate the fiber optic line on Bluebonnet's poles, Etan was required to obtain its own easement from affected private property owners. He further testified concerning his understanding of cable companies' practices prior to *Krohn I* that they would install their lines on electric cooperatives' poles without obtaining their own easements from private property owners.[12]

Nietsche testified concerning Fayette's pole attachment agreements with Etan and concerning standard practices in the cable industry. He testified that the standard practice for cable companies was to attach their lines to electric cooperative's poles only after obtaining their own

---

[11] Bluebonnet obtained an easement on the Hwy 77 Property in 1962 and two easements for separate locations on the Hwy 290 Property in 1961 and 1980, respectfully. Assignment and transfer agreements concerning pole attachment agreements also were admitted as exhibits at trial.

[12] Wren testified:

Q.  Because before *Krohn* everyone out there—when I say out there I'm talking about Bluebonnet Electric Co-op, all these cable companies thought that they could hang cable lines on your poles; isn't that true?

A.  That's correct.

9

easements from private property owners, and he denied that he had entered into an oral agreement on behalf of Fayette with Smith that authorized Etan to use Fayette's easements.

Both parties rested at the conclusion of the Lehmanns' witnesses, and the district court submitted the case to the jury. The jury found that Etan trespassed on the Hwy 77 Property but not on the Hwy 290 Property[13] and that Etan made a negligent misrepresentation on which the Lehmanns justifiably relied concerning the Hwy 77 Property. The jury also found that (i) Etan's trespass and/or negligent misrepresentation proximately caused damage to either the Lehmanns' property or the property rights associated with their ownership, (ii) $15,000 would fairly and reasonably compensate the Lehmanns for their damages that resulted from Etan's trespass and/or negligent misrepresentation, (iii) $65,000 was a reasonable fee for the necessary services of the Lehmanns' attorney through trial, (iv) the Lehmanns filed their lawsuit within two years of the date that they discovered or, in the exercise of reasonable diligence, should have discovered the injury to their properties or their property rights caused by Defendant's actions, (v) Etan fraudulently concealed its actions of trespass and/or negligent misrepresentation as to the Hwy 77 Property but not the Hwy 290 Property, and (vi) the date that the Lehmanns knew or should have known that Etan had fraudulently concealed its wrongful conduct was July 1, 2004.

---

[13] The jury found in Etan's favor that Etan's negligence, if any, did not proximately cause injury to the Lehmanns' properties and that Etan did not trespass or make a negligent misrepresentation as to the Hwy 290 Property. The jury also found that Etan had a prescriptive easement on the Hwy 290 Property and that the harm to the Lehmanns was not the result of Etan's malice. The Lehmanns have not appealed the jury's findings in favor of Etan regarding the Hwy 290 Property.

The district court thereafter entered judgment in accordance with the jury's verdict. The district court awarded the Lehmanns damages of $15,000 plus attorney's fees of $65,000 and granted declaratory and injunctive relief.[14] This appeal followed.

## ANALYSIS

In seven issues, Etan contends that (i) the Lehmanns' tort claims are barred as a matter of law based upon limitations, (ii) the district court erred in granting injunctive relief, (iii) there was no evidence to support injunctive relief, (iv) the district court erred in granting declaratory relief, (v) the district court erred in awarding actual damages based on a loss of use measure of damages, (vi) the evidence was legally and factually insufficient to support the damages award, and (vii) the district court erred in awarding attorney's fees.

### *Limitations*

In its first issue, Etan contends that the Lehmanns' tort claims of trespass and negligent misrepresentation concerning the Hwy 77 Property—brought in April 2006—are barred as a matter

---

[14] In accordance with the jury verdict, the district court found that Etan had a prescriptive easement over the Hwy 290 Property:

> This Court finds that Defendant has established the elements for a prescriptive easement over Plaintiffs' Hwy 290 Property . . . within the boundaries of Bluebonnet Electric Cooperative's current electrical easement as located on and across Plaintiffs' Hwy 290 Property . . . , for the sole purpose of installing, operating, maintaining, removing and replacing a single telecommunication cable to be attached to Bluebonnet Electric Cooperative's poles located within the boundaries of Bluebonnet Electric Cooperative's current easement as located on and across Plaintiffs' Hwy 290 Property . . . .

The Lehmanns have not challenged this finding.

11

of law based upon limitations.[15]  Etan urges that the applicable two-year limitations periods expired in December 2002 because the Lehmanns were aware of Etan's line on the Hwy 77 Property in December 2000.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (West Supp. 2009) (two-year limitations period for trespass for injury to property); *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 885 (Tex. 1998) (two-year statute of limitations applies to negligent misrepresentation claims).  The Lehmanns counter, among their defenses, that the fraudulent concealment doctrine applied to toll the accrual of the limitations periods until July 2004.  They contend that they first knew or should have known of their injury concerning the Hwy 77 Property when they received the documents from Bluebonnet in July 2004.[16]

In order to establish that limitations barred the Lehmanns' tort claims, Etan had to establish the date on which the Lehmanns' tort claims accrued.  *See W.W. Laubach Trust v. Georgetown Corp.*, 80 S.W.3d 149, 159 (Tex. App.—Austin 2002, pet. denied).  Generally, a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy.  *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003).  The date a cause of action accrues for purposes of limitations is

---

[15]  Because the jury found in favor of Etan on the Lehmanns' tort claims concerning the Hwy 290 Property and the Lehmanns do not appeal those findings, we limit our discussion in this section to the Hwy 77 Property.

[16]  The Lehmanns also asserted the defenses of the discovery rule and the continuing tort doctrine.  *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003) (discovery rule discussed); *W.W. Laubach Trust v. Georgetown Corp.*, 80 S.W.3d 149, 159 (Tex. App.—Austin 2002, pet. denied) (discovery rule and continuing tort doctrine discussed).  Because we conclude that the fraudulent concealment doctrine applies to toll the limitations periods, we need not address the Lehmanns' other two defenses to limitations.  *See* Tex. R. App. P. 47.1.

12

a question of law for the court. *See Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 274-75 (Tex. 2004); *Knott*, 128 S.W.3d at 221.

### 1. Fraudulent Concealment Doctrine

The affirmative defense of fraudulent concealment, when applicable, defers the accrual of a cause of action because "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *See S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996); *see also Kerlin v. Sauceda*, 263 S.W.3d 920, 925 (Tex. 2008); *Cherry v. Victoria Equip. & Supply, Inc.*, 645 S.W.2d 781, 782 (Tex. 1983). The burden is on the plaintiff to establish the elements of fraudulent concealment. *KPMG Peat Marwick v. Harrison County Housing Fin. Corp.*, 988 S.W.2d 746, 749-50 (Tex. 1999); *Santanna Natural Gas Corp. v. Hamon Operating Co.*, 954 S.W.2d 885, 890 (Tex. App.—Austin 1997, pet. denied).

Fraudulent concealment does not extend a limitations period indefinitely; it defers it until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the wrongful conduct. *Kerlin*, 263 S.W.3d at 925; *KPMG Peat Marwick*, 988 S.W.2d at 750. Whether fraudulent concealment exists and when a plaintiff knows, or in the exercise of reasonable diligence should know, of the wrongful conduct are fact questions. *See Cherry*, 645 S.W.2d at 782 ("The ultimate duty to weigh the evidence, determine credibility and decide if fraudulent concealment actually existed rests upon the trier of fact."); *Cadle Co. v. Wilson*, 136 S.W.3d 345, 352 (Tex. App.—Austin 2004, no pet.) ("When a plaintiff knew or should have known of an injury is generally a question of fact."); *Santanna Natural Gas Corp.*, 954 S.W.2d at 892 ("Determining what a reasonable person would have done or should have known are normally questions of fact.").

13

2.	*Legal Sufficiency of the Evidence*

Etan urges that it did not fraudulently disclose anything and there was no fact issue to submit to the jury regarding fraudulent concealment. Etan in essence challenges the legal sufficiency of the evidence to support the jury's findings that (i) Etan fraudulently concealed its wrongful conduct of trespass and/or negligent misrepresentation concerning the Hwy 77 Property, (ii) the Lehmanns filed suit within two years of when they discovered or, in the exercise of reasonable diligence, should have discovered their injury, and (iii) the Lehmanns knew, or in the exercise of reasonable diligence should have known, that Etan had fraudulently concealed its trespass and negligent misrepresentation as of July 1, 2004. These findings support that the Lehmanns' causes of action accrued in July 2004, giving them until July 2006 to file their claims. *See Santanna Natural Gas*, 954 S.W.2d at 890. Their claims brought in April 2006, therefore, would not be time barred. We turn to a review of the evidence then to support the jury's findings.

A)	Standard of Review

A legal sufficiency challenge may be sustained when the record discloses one of the following situations: (i) a complete absence of evidence of a vital fact; (ii) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (iii) the evidence offered to prove a vital fact is no more than a mere scintilla; or (iv) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In determining whether a finding is supported by legally sufficient evidence, we view the evidence in the light most favorable to the finding, "crediting favorable evidence if reasonable jurors could, and

14

disregarding contrary evidence unless reasonable jurors could not." *Id*. at 807. We indulge every reasonable inference that would support the finding. *Id*. at 822.

Moreover, it is within the province of the jury to resolve conflicts in the evidence. *See id.* at 819-20; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (jury remains sole judge of witnesses' credibility and weight to be given their testimony); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (jury can choose to believe one witness over other witnesses or resolve inconsistencies in their testimony).

B)      Fraudulent Concealment Finding

Because Etan does not challenge the definition of fraudulent concealment given to the jury, we measure the sufficiency of the evidence against the definition of fraudulent concealment in the charge. See *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). The jury was instructed that fraudulent concealment occurs when a party conceals or fails to disclose a material fact within the knowledge of that party, the party knows that the other party is ignorant of the fact and does not have equal opportunity to discover the truth, the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and the party suffers injury as a result of acting without knowledge of the undisclosed fact.

Etan relies on the Lehmanns' knowledge of the line in 2000 and Smith's acknowledgment to Steven in December 2000 that Etan owned the line. The Lehmanns' knowledge of the line, however, was not the disputed issue, and Etan's authority to own and operate the line on the Lehmanns' property was disputed. Whether Smith concealed or failed to disclose a material fact concerning Etan's authority to own and operate the line within his knowledge with the intent to

15

induce the Lehmanns to take action that resulted in injury to them was contested at trial. Evidence at trial showed that the Lehmanns decided to wait and not pursue the matter because they believed Smith's statements that Etan was authorized to be on their property—first that Etan had an easement and then that Etan had an agreement with Bluebonnet jointly to own and operate the line on Bluebonnet's poles along Highway 77.

There was also evidence to support a reasonable inference that Smith knew his statements to be misrepresentations. *See City of Keller*, 168 S.W.3d at 822. The evidence was that Smith, when first approached by Steven, told him that Etan had an easement for the line and that he would send Steven a copy. Smith testified at trial, however, that he had only obtained two easements from private property owners in all of his years in the business, and he had been working from the same office from the 1980s, except for the years that Insight owned the business. The jury could have concluded that Smith was not credible and could have reasonably inferred that he misrepresented Etan's authority to be on the Lehmanns' property—a fact that the Lehmanns did not know and did not have equal opportunity to discover the truth—to induce the Lehmanns not to pursue the matter. *See id.*; *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *McGalliard*, 722 S.W.2d at 697.

Similarly, the evidence was that Smith told Steven in the summer of 2001 that he was "mistaken" as to the easement but that Etan was "in partnership" with Bluebonnet concerning the line and had Bluebonnet's permission to use Bluebonnet's easements. Smith did not disavow these statements. Again, the jury could have reasonably inferred that Smith misrepresented the terms of the partnership between Bluebonnet and Etan concerning the line and Etan's authority under its

16

agreements with Bluebonnet—agreements not known by the Lehmanns and to which they did not

have equal opportunity to discover the truth—to induce the Lehmanns to stop pursuing the matter.[17]

Smith also testified to a letter he received from Bluebonnet in December 2002

concerning *Krohn I* and Bluebonnet's position that cable companies were required to obtain their own

easements from private property owners.[18] Smith testified that he did not contact the Lehmanns or

---

[17] The jury also could have concluded that Smith was not credible based upon his testimony on related matters. Smith testified that he had an oral agreement with Peterson for Etan to use Bluebonnet's easements, but Smith acknowledged that Peterson denied any oral agreement and the alleged oral agreement directly conflicted with the pole attachment agreements that required each party to obtain its own easements and rights-of-way. Smith further testified that the standard practice for cable companies was not to obtain their own easements. Nietsche testified otherwise, and the evidence showed that Insight—the predecessor company that did not employ Smith—obtained easements from private property owners. Smith's testimony concerning the standard practice in the industry was further undermined by his own testimony that he obtained an oral agreement with Peterson to use Bluebonnet's easements. Etan would not have needed an oral agreement with Bluebonnet if the standard practice allowed Etan to use Bluebonnet's easements in any event.

[18] The December 2002 letter was not provided to the Lehmanns prior to the litigation. Bluebonnet's representative states in the letter:

> Recently, a property owner south of Giddings, Texas was inquiring about [Etan] having the right to contact the Cooperative's distribution poles. The property owner also questioned whether or not the Cable Company should have to acquire their own easements when crossing private property. We responded by informing the property owner that the Cooperative has a contract with [Etan] which allows them to contact the [Bluebonnet] distribution poles. We further explained that the contract does not, however, provide assignment of the Cooperative's electrical utility easement to [Etan]. Therefore, the Cable Company is required to secure their own easements when crossing private property with their facilities.

> The property owner pointed out that a [Etan] representative informed him, that the distribution line south of Giddings was a joint venture with [Bluebonnet] and that [Etan] did not have to acquire easements from private landowners. This is a misinterpretation, because the Cooperative's contract with [Etan] does not reflect anything that substantiates [Etan] not having to acquire their own easements on joint projects.

17

any other landowners or take any other action in response to the letter. This evidence supports a reasonable inference that Smith knew at least by December 2002 that Etan lacked authority to place its cable line on the Lehmanns' property. The jury could have concluded that he concealed or failed to disclose that his prior statements to the Lehmanns were false to induce the Lehmanns to not act.

Based on this evidence, we conclude that the evidence was legally sufficient to support the jury's finding of fraudulent concealment. *See City of Keller*, 168 S.W.3d at 810.

C) Time of Discovery Finding

The issue of when the Lehmanns discovered or should have discovered Etan's wrongful conduct was also contested at trial. *See Kerlin*, 263 S.W.3d at 925. Ronald testified "July of '04" when asked "when do you believe you knew for the very first time that you had a claim against [Etan] for trespass on your Highway 77 property." He testified that he did not know before July 2004 because he did not have a copy of the agreements or easements. He testified concerning the reasons for the delay in discovering the claims against Etan, including the statements by Smith, his reliance on Smith's statements which he believed to be true, and the difficulty in obtaining the documents to determine Etan's authority to own and operate the line on the Hwy 77 Property.[19] It was

> By now, you may have heard that the Supreme Court has recently confirmed the law regarding one utility's use of another utility's easement. The Supreme Court ruled in a case out of the Hill Country, Texas, area that cable companies have to get their own easements from private landowners. Therefore, the Cooperative will continue to emphasize that all Cable Companies will have to acquire their own easements when crossing private property.

[19] Ronald testified that, in order to obtain the documents, they needed to know who the property owners were at the time the lines were constructed. Steven testified that they had to provide the names of the prior owners of their properties for Bluebonnet to look up their easements.

18

undisputed that the Lehmanns did not obtain a copy of the relevant documents, such as the amendment between Etan and Bluebonnet that provided the terms of the "joint project" concerning the line along Highway 77, until July 2004.[20]

The corporate representative for Bluebonnet, Byron Wren, testified consistently that the requested documents were difficult to locate and that it took a significant amount of time:

A. From the early times we—when we were going to build an electric facility on peoples' property our line designer, we call them, and staking techs would go out and design the line. They would draw it on a piece of paper, kind of like graphing paper, and it would show the open circles for proposed poles, any closed-in circles for existing poles. So it would show on a construction sheet, we called it, the proposed line to be built. And normally it would show some kind of landmark or whatever, you know, like a highway or things like that.

Q. And if I walked into your office today and said, you know, I own such and such piece of property and I need to know where your easement is, do I have to provide you my prior landowner?

A. It's nice if you do, because these lines were built many years ago.

Q. Okay. And I asked you for some documents, you did some searching and digging and that was a pretty in-depth—

A. It was very in-depth, yeah.

Q. Okay.

A. I needed help with it, put it that way.

Q. It took a while?

A. It took somebody with experience to really know how to do that kind of stuff.

---

[20] Etan does not contend that the easements or pole attachment agreements were recorded in the real property records of Lee County so as to put the Lehmanns on notice.

Q. All right. And we heard testimony from Mr. Steve Lehmann that you provided some documents back to me in July of '04. Does that sound right to you?

A. That's correct.

During cross-examination, Wren confirmed that it took Bluebonnet a year to respond to the Lehmanns' request.

Although a Bluebonnet representative told Steven in December 2002 that Etan was required to obtain its own easements, the representative's position was inconsistent with Smith's statements to Steven that Etan was authorized based, at least in part, on the partnership agreement between Etan and Bluebonnet concerning the line along Highway 77. The evidence also showed that, prior to July 2004, Bluebonnet did not charge a penalty to Etan for unauthorized attachments, did not demand that Etan remove the line, and did not remove the line itself despite having the authority to take each of these actions pursuant to the agreement between Etan and Bluebonnet. The jury could have credited this evidence as further support for its finding that July 1, 2004, was the date that the Lehmanns knew or should have discovered Etan's wrongful conduct. *See City of Keller*, 168 S.W.3d at 807, 822.

That the Lehmanns did not bring their suit against Etan within two years of December 2002 when *Krohn I* was released does not support setting aside the jury's finding. *See Cherry*, 645 S.W.2d at 782. Although Ronald testified to his understanding that cable companies were not permitted to use electric cooperative easements after *Krohn I*, he testified that he did not have a copy of the decision or even know its name until July 2004 and it was not until he had a copy of the case and the relevant documents that he knew he had a claim against Etan. Even Smith

20

testified that it took him time to understand the impact of *Krohn I* and that he continued to question the opinion's applicability to the line on the Lehmanns' property. Smith also testified that he did not know what the decision said or anything about the process up to the supreme court and then back to the trial court.[21]

We conclude that the evidence was legally sufficient to support the jury's findings that Etan fraudulently concealed its wrongful conduct and the Lehmanns discovered or should have discovered this conduct by July 1, 2004.

Alternatively, Etan urges that the fraudulent concealment doctrine was inapplicable to toll the limitations periods because the doctrine is limited to situations in which a defendant has a duty to disclose, such as when there is a fiduciary relationship between the parties. *See Cadle Co.*, 136 S.W.3d at 354 (fraudulent concealment doctrine limited to those situations in which the defendant has a duty to disclose; cases where the doctrine applies are rare, such as those involving fiduciary relationships). The existence of a duty to disclose is a question of law for the court. *Id*. In *Cadle*, this Court held the doctrine inapplicable to toll limitations where "[n]o such duty [to disclose] or relationship" was asserted by either party. *See id*.

That the Lehmanns do not assert a fiduciary relationship with Etan, however, does not preclude the doctrine from applying here. The doctrine may also apply when a defendant makes affirmative misrepresentations. *See Santana Natural Gas Corp.*, 954 S.W.2d at 891 ("We therefore hold that affirmative misrepresentations can support a fraudulent concealment defense to a statute of

---

[21] Etan continues to question *Krohn I* with this Court; Etan states that "[i]t is not clear if *Krohn* applies to fiber optic cable," the cable at issue on the Hwy 77 Property.

limitations bar even in the absence of a duty to disclose."); *see also World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 670 (Tex. App.—Fort Worth 1998, pet. denied) (duty to disclose may arise when "a party later learns that a previous affirmative representation was false or misleading"). The Lehmanns asserted and presented evidence that Smith, on behalf of Etan, made affirmative misrepresentations concerning Etan's authority to place its cable line on their property on which the Lehmanns relied. The lack of a fiduciary relationship between Etan and the Lehmanns then did not foreclose the doctrine from applying based upon Smith's "affirmative misrepresentations." *See Santana Natural Gas Corp.*, 954 S.W.2d at 891.

We conclude that the accrual date of the Lehmanns' tort causes of action was tolled until July 1, 2004, and, therefore, that limitations did not bar those claims. We overrule Etan's first issue.[22]

### Declaratory Relief

In its fourth and seventh issues, Etan contends that the district court erred in granting the Lehmanns' declaratory relief. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008) (the "Act"). Etan urges that the declaratory judgment was improper because there was no live justiciable controversy—Etan's cable lines were removed from both properties prior to trial—and the declarations added nothing to what was otherwise implicit or express in the final judgment

---

[22] Etan's reliance on our sister court's ultimate resolution on remand of *Krohn I* is misplaced. *See Krohn v. Marcus Cable Assocs., L.P.*, 201 S.W.3d 876 (Tex. App.—Waco 2006, pet. denied) ("*Krohn II*"). In *Krohn II*, our sister court held that the Krohns' claim of trespass for unauthorized cable line was time barred because their claim accrued when the cable line was placed on their property. *Id.* at 881. But the Krohns failed to plead the discovery rule, and there were no allegations of fraudulent concealment to toll the limitations period. *Id.* at 880.

22

concerning the Lehmanns' trespass claim. Etan also contends that declaratory relief was unavailable without joining Bluebonnet as a responsible third party to the suit and that it was harmed and prejudiced by the district court's ruling during trial reinstating the Lehmanns' declaratory claims. Further, based upon its contention that declaratory relief should not have been granted, Etan contends that the district court erred in awarding attorney's fees under the Act.

The district court made the following declarations in the final judgment:

> Bluebonnet Electric Cooperative's electrical easements across Plaintiffs' Hwy 77 Property and Plaintiffs' Hwy 290 Property . . . did not and do not provide Defendant (or any of Defendant's predecessors) with a telecommunications easement or any right-of-way on, over or across Plaintiffs' Hwy 77 Property or Plaintiffs' Hwy 290 Property . . . for the construction, installation, presence, operation or maintenance of fiber optic cable(s) or television cable(s) for television or any other communication services.
>
> [N]one of Defendant's (or Defendant's predecessors') agreements with Bluebonnet Electric Cooperative (or Bluebonnet Electric Cooperative's predecessors) (including all written or oral agreements and/or amendments thereto) provided or provides Defendant (or any of Defendant's predecessors) with a telecommunications easement or any right-of-way on, over or across Plaintiffs' Hwy 77 Property or Plaintiffs' Hwy 290 Property . . . for the construction, installation, presence, operation or maintenance of fiber optic cable(s) or television cable(s) for television or any other communication services.

The district court also awarded the Lehmanns their attorney's fees through trial of $65,000.

### 1. *Standard of Review*

Declaratory judgments are reviewed under the same standards as other judgments or decrees. *Id.* § 37.010. We must uphold the judgment of the trial court if it can be sustained upon any legal theory supported by the evidence. *See Bell v. Katy Indep. Sch. Dist.*, 994 S.W.2d 862, 864 (Tex.

23

App.—Houston [1st Dist.] 1999, no pet.); *Oak Hills Props. v. Saga Rests., Inc.*, 940 S.W.2d 243, 245 (Tex. App.—San Antonio 1997, no writ).

Pursuant to section 37.009 of the Act, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009. We review the award of attorney's fees under the Act for abuse of discretion. *See Boquet v. Herring*, 972 S.W.2d 19, 20-21 (Tex. 1998). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). It is an abuse of discretion to award attorney's fees under the Act when the statute is relied upon solely as a vehicle to recover attorney's fees. *See Strayhorn v. Raytheon E-Sys., Inc.*, 101 S.W.3d 558, 572 (Tex. App.—Austin 2003, pet. denied). "[A] party cannot use the Act as a vehicle to obtain otherwise impermissible attorney's fees." *See MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009) ("[T]he Act cannot be invoked when it would interfere with some other exclusive remedy or some other entity's exclusive jurisdiction.").

2.  *Are the Lehmanns' declaratory claims moot?*

Etan first contends that the Lehmanns' declaratory claims are moot because Etan removed its cable lines from the Lehmanns' properties during the pendency of the case. The mootness doctrine requires that courts avoid rendering advisory opinions by only deciding cases that present a "live" controversy at the time of the decision. *Camarena v. Texas Employment Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988). "A case becomes moot when: (1) it appears that one seeks to obtain a judgment on some controversy, when in reality none exists; or (2) when one seeks a judgment on some matter which, when rendered for any reason, cannot have any practical legal effect

24

on a then-existing controversy." *Texas Health Care Info. Council v. Seton Health Plan, Inc.*, 94 S.W.3d 841, 846-47 (Tex. App.—Austin 2002, pet. denied). A case may become moot when allegedly wrongful behavior has passed and could not be expected to recur. *Securities & Exch. Comm'n v. Medical Comm. for Human Rights*, 404 U.S. 403, 406 (1972).

A declaratory judgment action, however, is not moot "when a party voluntarily abandons the conduct at issue 'without any binding admission or extrajudicial action that would prevent a recurrence of the challenged action.'" *Bexar Metro. Water Dist. v. City of Bulverde*, 234 S.W.3d 126, 131 (Tex. App.—Austin 2007, no pet.) (quoting *Texas Health Care Info. Council*, 94 S.W.3d at 849-50); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000) ("A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case."). The standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: "A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 170 (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). The "'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* at 189. And declaratory relief is appropriate to "fully terminate all controversies between the parties." *See Bright v. Addison*, 171 S.W.3d 588, 606 (Tex. App.—Dallas 2005, pet. denied) (trial court "has discretion to enter a declaratory judgment as long as it will serve a useful purpose or will terminate the controversy between the parties").

Although Etan removed the cable lines from both properties prior to trial, Bluebonnet's easements remained on the properties; Etan and Bluebonnet continued their business relationship; and the pole attachment agreement remained in place between Etan and Bluebonnet going forward. Further, Etan's authority to place its cable lines on the Lehmanns' properties was contested at trial with Smith testifying that Etan was authorized to use Bluebonnet's easements. Smith testified that Etan was authorized to use Bluebonnet's easements based in part on his oral agreement with Peterson. As to the Hwy 77 Property, Smith testified:

> Q.    Okay. And so that the jury knows, in February of 2007 when I took your deposition you still thought [Etan] had at least the authority to have been on the Highway 77 poles on my clients' property.
>
> A.    Yes, and I still do.

Etan also contended that the line on the Hwy 77 Property was owned jointly by Bluebonnet and Etan—12 strands of fiber optic were owned by Bluebonnet, and 12 strands were owned by Etan—pursuant to the amendment to the pole attachment agreement concerning that line.

Smith further testified that (i) Etan has continued to place its lines on private property without private property owners' permission, (ii) Etan has not contacted private property owners that had previously been told—similar to the Lehmanns—that Etan was authorized to use Bluebonnet's easements to place its lines on their private property,[23] (iii) he had not obtained easements on Etan's

---

[23] Although Smith testified that they knocked on doors to let landowners know that they were removing the abandoned line on Highway 77, he testified:

> Q.    Okay. Now, you told me in your deposition during the construction of the Highway 77 line you spoke I believe you said with six or so landowners.

26

behalf from private property owners for the placement of its lines, except in two instances, (iv) Etan has taken actions only when sued,[24] and (v) Etan has not changed how it does business. Etan continued to operate "260 to 80 miles" of coaxial cable line and "probably less than half" of fiber optic lines.[25]

---

A.  I didn't specifically. The people—[Etan] employees spoke with some, I spoke with some. I don't—that was just a number off the top of my head. I was guessing.

Q.  Okay. And you told me that each time one of those people talked to one of y'all that you told them that you were in partnership with Bluebonnet and you had Bluebonnet's permission to use the easement.

A.  Yes, I did.

Q.  Same thing you ultimately ended up telling Steve Lehmann.

A.  Yes.

* * *

Q.  And all of those people that you told you're in partnership with Bluebonnet and you have permission to use their easement, have you ever gone back, sir, and told them that that's in fact not right?

A.  No, sir, I have not.

Q.  Okay. In fact, you have no intention of doing that, do you?

A.  Not unless I'm directed to.

[24] For example, after Steven brought suit against Etan for trespass on his property, Etan deactivated the line along Highway 77 and removed the portion of the line on Steven's property. Etan did not remove the portion of the line on the Lehmanns' Hwy 77 Property at that time. It was only after the Lehmanns brought suit that Etan removed the line from their properties.

[25] Smith testified that Etan had fiber optic lines from Schulenburg to Weimar, Schulenburg to La Grange, and Schulenburg to Halletsville.

The effect of *Krohn I* on Etan's authority to maintain lines on private property also remained contested at trial. Although Smith testified that cable companies' lines on private property without easements from the landowner would be trespassing after *Krohn I*, he also testified to his understanding that "things have changed" based upon *Krohn v. Marcus Cable Assocs.*, L.P., 201 S.W.3d 876 (Tex. App.—Waco 2006, pet. denied) ("*Krohn II*").[26] Given the continued relationship between Bluebonnet and Easement, Etan's course of conduct, and Etan's position at trial, we conclude that Etan's removal of its cable lines during the pendency of the case did not moot the Lehmanns' declaratory claims. *See Bright*, 171 S.W.3d at 606.

---

[26] Smith testified:

Q. Okay. We've talked about *Krohn* in 2002, right?

A. Right.

Q. All right. Your lawyer can ask you all he wants to about the limitations. I'm just talking about trespassing, not whether or not you can sue for it. Is it a trespass? Okay. You've told me that after *Krohn* if you are attached to a pole on private property without an easement from a landowner that is a trespass, correct?

A. I would have said that in my deposition and as I said, that was before—I understand things have changed. So I don't really know how to answer that question.

\* \* \*

Q. And have you agreed with me, sir, that after *Krohn*, which is 2002, [Etan] would be trespassing on my clients' Highway 77 property up until the day the line was removed?

A. From *Krohn* 2002 I would have to say that we were but I don't—there has been some change to the *Krohn* since then.

3.      *Was declaratory judgment improper because it added nothing to what was implicit or explicit in the final judgment?*

Relying on *Hageman/Fritz, Byrne, Head & Harrison, L.L.P. v. Luth*, 150 S.W.3d 617, 627 (Tex. App.—Austin 2004, no pet.), Etan urges that the district court's declarations add nothing to what is "implicit or expressed" in the final judgment on the Lehmanns' trespass claim. In that case, this Court concluded that: "[t]here is no basis for declaratory relief when a party is seeking in the same action a different, enforceable remedy, and a judicial declaration would add nothing to what would be implicit or express in a final judgment for the enforceable remedy." *Id.* (quoting *Universal Printing Co. v. Premier Victorian Homes, Inc.*, 73 S.W.3d 283, 296 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)).

Etan does not dispute the merits of the district court's declarations and fails to address that the final judgment does not provide the Lehmanns with an "enforceable remedy" for Etan's alleged trespass on the Hwy 290 Property. *See id.* Given the jury's findings that Etan did not trespass on the Hwy 290 Property but on the Hwy 77 Property, the jury's finding that Etan has a prescriptive easement on the Hwy 290 Property, Smith's position at trial concerning *Krohn II*, and Etan's ongoing agreement with Bluebonnet to use its easements, the declarations afforded the parties' "relief from uncertainty and insecurity" with respect to their "rights, status, and other legal relations" concerning the central dispute in the case—Etan's authority to attach its cable lines to Bluebonnet's poles on the Lehmanns' properties without the Lehmanns' permission. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.002; *Universal Printing Co.*, 73 S.W.3d at 296-97 (in dispute over access to an alley, declaratory

29

relief warranted because of existence of adverse possession affidavits in public records to alley and individuals at trial continued to testify that they owned the alley). Further, the Texas Supreme Court recently explained that the existence of another adequate remedy does not bar the right to maintain an action for declaratory judgment. *See MBM Fin. Corp.*, 292 S.W.3d at 669; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 37.003(a) ("A court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.").

On this record, we cannot conclude that the district court's declarations "add[ed] nothing to what would be implicit or express in a final judgment for the enforceable remedy" of trespass on the Hwy 77 Property.[27] *See Hageman/Fritz, Byrne, Head & Harrison, L.L.P.*, 150 S.W.3d at 627.

4.     *Was declaratory relief improper because Bluebonnet was not joined as a party?*

Etan also contends that declaratory relief was improper because the Act required the Lehmanns to join Bluebonnet as a responsible third party. Etan urges that Bluebonnet was a responsible third party because it owned 12 of the 24 strands of fiber optic cable on the Hwy 77 Property and it was a party to agreements that the district court construed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.006(a) ("When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties.").

---

[27] For example, as to the Hwy 290 Property, the district court's declaration sets out the parameters of the prescriptive easement resolving uncertainty between the parties as to the scope of the easement. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.002 (West 2008).

As a general rule, trial courts exercise broad discretion in matters of joinder. *Davis v. Devon Energy Prod. Co.*, 136 S.W.3d 419, 421 (Tex. App.—Amarillo 2004, no pet.). Furthermore, a person's absence will seldom deprive a court of jurisdiction to adjudicate the rights of the parties who are present. *Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex. 1982).

Although the agreements between Bluebonnet and Etan and Etan's predecessors were the subject of the declarations, the Lehmanns sought declarations limited to Etan's rights under the agreements, not Bluebonnet's. *See Davis*, 136 S.W.3d at 421. Moreover, as to the fiber optic line on the Hwy 77 Property, the evidence at trial showed that Bluebonnet did not pay for the line and never accessed the line before the line's removal.[28] *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.006(a) (declarations do not prejudice parties not joined); *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163 (Tex. 2004). We conclude that the Lehmanns' failure to join Bluebonnet did not preclude the district court's declarations against Etan.

5.       *Did the district court err in reinstating the declaratory claims during trial?*

Etan further complains that the district court's reversal of its ruling granting Etan's motion for partial summary judgment on the Lehmanns' declaratory claims during trial prevented Etan from properly presenting its claims and defending against the Lehmanns' claims.[29] A trial court

---

[28] The amendment between Etan and Bluebonnet concerning the fiber optic line along Highway 77 stated that "[u]pon receipt of mutually agreed upon funds," Etan agreed to provide Bluebonnet access to the line. Wren testified that Bluebonnet was never granted access and never operated the line. Wren also testified that the first invoice that Bluebonnet received from Etan for half of the cost of the line's construction was in 2004 and that Bluebonnet did not intend to pay the invoice.

[29] Etan also urges that it did not try by consent the Lehmanns' declaratory claims. But, Etan's consent was not required for the district court to set aside its summary judgment ruling on the

may set aside a previously granted summary judgment as long as the trial court affords the parties the opportunity to litigate the issue. *See Bi-Ed, Ltd. v. Ramsey*, 935 S.W.2d 122, 123 (Tex. 1996); *Elder Constr., Inc. v. City of Colleyville*, 839 S.W.2d 91, 92 (Tex. 1992). Here, after the district court's ruling setting aside its summary judgment ruling on the Lehmanns' declaratory claims, both sides had the opportunity to present evidence concerning those claims. Further, Etan has failed to show what it would have done differently—how it was prejudiced or harmed by the timing of the district court's ruling. *See* Tex. R. App. P. 44.1.

We conclude that the district court did not err in awarding declaratory relief to the Lehmanns. We overrule Etan's fourth issue.

### 6.     *Attorney's Fees*

In its seventh issue, Etan does not challenge the amount of attorney's fees awarded but contends that the district court erred in awarding any attorney's fees under the Act because the Lehmanns' declaratory claims "were simply a thinly-veiled attempt to collect attorneys' fees in a tort case."

The Lehmanns' tort claims do not support an award of attorney's fees. *See Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture*, 50 S.W.3d 531, 550 (Tex. App.—El Paso 2001, no pet.) ("[A]ttorney's fees are not recoverable in tort actions."). The issue then is whether the declarations sought were redundant of their tort claims already before the district court. Given our conclusion that they were not, we cannot conclude that the district court abused its discretion in awarding the

---

Lehmanns' declaratory claims. *See Bi-Ed, Ltd. v. Ramsey*, 935 S.W.2d 122, 123 (Tex. 1996); *Elder Constr., Inc. v. City of Colleyville*, 839 S.W.2d 91, 92 (Tex. 1992).

Lehmanns attorney's fees under the Act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009; *Bocquet*, 972 S.W.2d at 20. We overrule Etan's seventh issue.

## *Injunctive Relief*

In its second and third issues, Etan contends that the district court erred in granting injunctive relief. Etan urges—as it did regarding the declaratory relief awarded by the district court—that there was no live controversy because Etan removed its lines from the Hwy 77 Property before the trial. Alternatively, Etan contends that there was no evidence to support two of the elements for granting injunctive relief—imminent harm and irreparable injury.

The district court's injunctive relief is consistent with the district court's declarations concerning the Hwy 77 Property that Etan does not have an easement or an agreement that authorizes it to construct, install, or operate its cable lines on that property. The district court permanently enjoined and restrained Etan from:

1. Constructing, installing, hanging, placing, attaching, allowing, commingling, operating or maintaining any additional or other fibers, sets of fibers or fiber optic cables on any of the electric utility poles which run across Plaintiffs' Hwy 77 Property . . .;

2. Constructing, installing, hanging, placing, attaching, allowing, commingling, operating or maintaining any additional or other fibers, sets of fibers, or fiber optic cables on any other part or portion of Plaintiffs' Hwy 77 Property . . .;

3. Entering on, traveling across or traversing any part or portion of Plaintiffs' Hwy 77 Property . . . ;

4. Interfering with, interrupting, disrupting, preventing, delaying or prohibiting the full, sole and exclusive use, enjoyment and possession of Ronald Lehmann and Dana Lehmann of Plaintiffs' Hwy 77 Property . . . .

The district court also made the following findings in its judgment with respect to the Lehmanns' claims for injunctive relief: (i) the failure to grant permanent injunctive relief to the Lehmanns would likely result in further interference and invasion of the Lehmanns' property rights and/or damages, (ii) the Lehmanns have demonstrated the need for permanent injunctive relief to protect their property rights and to prevent further damages, and (iii) unless a permanent injunction is issued, the Lehmanns would suffer immediate and irreparable injury and would have no adequate remedy at law.

Injunctive relief is an equitable remedy that may be granted upon a showing of (1) the existence of a wrongful act, (2) the existence of imminent harm, (3) the existence of irreparable injury, and (4) the absence of an adequate remedy at law. *See Beathard Joint Venture v. West Houston Airport Corp.*, 72 S.W.3d 426, 432 (Tex. App.—Texarkana 2002, pet. denied); *Webb v. Glenbrook Owners Ass'n.*, No. 05-07-01122-CV, 2009 Tex. App. LEXIS 7691, at *17 (Tex. App.—Dallas Oct. 1, 2009, no pet.) (mem. op.). We review the granting or denial of a permanent injunction for an abuse of discretion. *See Operation Rescue-Nat'l v. Planned Parenthood*, 975 S.W.2d 546, 560 (Tex. 1998); *Downer*, 701 S.W.2d at 241-42.

1.    *Are the Lehmanns' claims for injunctive relief moot?*

Consistent with its position that the Lehmanns' declaratory claims were moot, Etan urges that the Lehmanns' claims for injunctive relief are moot. For the same reasons that we conclude Etan's removal of its lines did not moot the Lehmanns' claims for declaratory relief, we also conclude that the removal of the lines on the Hwy 77 Property did not moot the Lehmanns' request for

34

injunctive relief. *See Camarena*, 754 S.W.2d at 151; *Texas Health Care Info. Council*, 94 S.W.3d at 849-50. The controversy remained at trial concerning Etan's authority to place and operate its fiber optic lines on the Hwy 77 Property, and Etan maintained a pole attachment agreement with Bluebonnet. *See also State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 804 (Tex. 1979) ("The probability of the continuation of the prohibited practices is not a matter which is susceptible of direct proof, and injunctive relief is proper when the trial court finds it justified under the rules of equity, notwithstanding a defendant's cessation of the activity or solemn promises to cease the activity.").

2.     *Was the evidence legally sufficient to support injunctive relief?*

Relying on the removal of its lines on the Hwy 77 Property, Etan also challenges the legal sufficiency of the evidence of imminent harm and irreparable injury, urging that there was no evidence to support these elements. *See City of Keller*, 168 S.W.3d at 810. Irreparable injury may be satisfied "where the remedy at law is inadequate because of the nature of the injury or the multiplicity of actions necessary to obtain re-dress." *Beathard Joint Venture*, 72 S.W.3d at 432. The district court could have considered the "nature of the injury or the multiplicity of actions" and credited the evidence of Etan's continued course of conduct to conclude that there was evidence of irreparable injury to the Lehmanns without injunctive relief. *See id*. The evidence showed that Etan removed the portion of its line on Steven's property after Steven brought suit but did not remove the portion of the line on the Hwy 77 Property at that time; the trespass on the Hwy 77 Property continued after the Lehmanns filed suit against Etan; Etan continued its relationship with Bluebonnet pursuant to the pole attachment agreement; and Etan continued to operate cable lines on private property without obtaining easements from landowners unless sued.

35

Concerning imminent harm, although Etan urges that there is no evidence that it intends to place cable line on the Hwy 77 Property, Etan also maintained at trial that it had an oral agreement with Bluebonnet to use its poles and questioned the breadth of *Krohn I* based upon our sister court's ultimate resolution in *Krohn II*. Etan's continued relationship with Bluebonnet and its position at trial support the finding of imminent injury to the Lehmanns without injunctive relief. *See Texas Pet Foods, Inc.*, 591 S.W.2d at 804. We conclude that the evidence was legally sufficient to support findings of imminent harm and irreparable injury to the Lehmanns without injunctive relief.

On this record, we cannot conclude that the district court abused its discretion in granting injunctive relief as to the Hwy 77 Property consistent with its declarations. *See Operation Rescue-Nat'l*, 975 S.W.2d at 560. We overrule Etan's second and third issues.

***Damages***

In its fifth and sixth issues, Etan contends that the district court submitted an improper measure of damages to the jury and, even if the submitted measure of damages was proper, the evidence was legally and factually insufficient to support the jury's award of $15,000.

*1.    Measure of Damages*

Etan urges that the district court submitted an improper measure of damages to the jury because the proper measure of damages for its trespass is permanent damage to land or the difference in market value immediately before and immediately after the trespass. *See Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984) (measure of damages for permanent injury to land is difference in market value immediately before and immediately after the trespass); *Mieth*

36

*v. Ranchquest, Inc.*, 177 S.W.3d 296, 303 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (measure of damages for permanent injury to land is diminution in value); *Krohn II*, 201 S.W.3d at 881 (cable line on property for decade constituted permanent trespass).

Rule 278 of the rules of civil procedure requires a court to submit questions, instructions, and definitions to the jury that are raised by the written pleadings and the evidence and necessary to enable the jury to render a verdict. Tex. R. Civ. P. 278; *Goose Creek Consol. Indep. Sch. Dist. v. Jarrar's Plumbing, Inc.*, 74 S.W.3d 486, 499 (Tex. App.—Texarkana 2002, pet. denied). Complaints of error in the jury charge are reviewed under an abuse of discretion standard. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000) ("The trial court has considerable discretion to determine necessary and proper jury instructions."); *Downer*, 701 S.W.2d at 241-42. To reverse a judgment based on a claimed error in the jury charge, a party also must show that the error probably resulted in the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002) (error in refusing an instruction); *Goose Creek Consol. Indep. Sch. Dist.*, 74 S.W.3d at 500 (where instruction is defective in stating the proper measure of damages, error is subject to harmless error review); *Niemeyer v. Tana Oil & Gas Corp.*, 39 S.W.3d 380, 387 (Tex. App.—Austin 2001, pet. denied) (error in jury charge).

The district court asked the jury what sum of money would fairly and reasonably compensate the Lehmanns for their damages, if any, that resulted from Etan's actions of trespass and/or negligent misrepresentation with the following instruction:

Consider the elements of damages listed below and none other.

37

Loss of Use—The reasonable value for the loss of the use of Plaintiffs' properties or their property rights used by the Defendant when Defendant transmitted signals through or added new or additional products into its cable across Plaintiffs' Hwy 77 Property and Plaintiffs' Hwy 290 Property. Do not include any amount in your answer that you find Plaintiffs could have avoided by the exercise of reasonable care.

The jury answered $15,000 for the Hwy 77 Property and zero damages for the Hwy 290 Property.[30]

The Lehmanns did not seek or present evidence that would support an award of damages based upon the difference in market value before and after Etan placed its cable line on the Hwy 77 Property. The district court would have erred then in submitting the measure of damages that Etan proposes. *See* Tex. R. Civ. P. 278 (court not authorized to submit instructions that are not raised by pleadings and evidence). The Lehmanns sought and the district court instructed the jury that the

---

[30] Etan does not challenge the jury's finding of trespass or the definition of trespass submitted to the jury. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Trespass was defined for the jury as follows:

"[T]respass" means to enter and/or remain on the property of another without having consent of the owner. To constitute trespass, entry and/or continued presence upon another's property need not be in person but may be done by causing or permitting a thing or object to cross the boundary of the property. Every unauthorized entry or continued presence upon the land of another is a trespass and the intent, motive or good faith prompting the trespass is immaterial.

The jury also answered "yes" when asked "[w]as the transmission of signals through or the addition of new or additional products into Defendant's cable across Plaintiffs' Hwy 77 Property or Plaintiffs' Hwy 290 Property, intermittent or recurrent until said transmissions or additional products were terminated by Defendant." The jury was instructed that "an injury is temporary if it is intermittent or recurrent" and "an injury is permanent if it is sufficiently constant or regular, so that future impact can be reasonably evaluated." *See Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 274-75 (Tex. 2004) (discussion of difference between temporary and permanent injury to land). Smith testified that the line on the Hwy 77 Property was activated and operational until February 2005 and that Etan added new products—more channels and high-speed internet—at various times during the line's operation.

applicable measure of damages was temporary injury or the value of the loss of use of their property or their property rights. *See Southwestern Bell Tel. Co. v. Hamil*, 116 S.W.3d 798, 800 (Tex. App.—Fort Worth 2003, no pet.); *Goose Creek Consol. Indep. Sch. Dist.*, 74 S.W.3d at 499. Under this measure of damages, where the property at issue is not "rentable," the owner may resort to proving the actual worth of the use. *Goose Creek Consol. Indep. Sch. Dist.*, 74 S.W.3d at 497. The Lehmanns' theory was that Etan trespassed on the Hwy 77 Property both by installing and operating its line. Their measure of damages then was the "actual worth" of Etan's use—operating the line—of the Lehmanns' property or property rights. *See id*.

The analysis and reasoning in *Hamil* is instructive. In *Hamil*, landowners discovered a buried telephone line on their property and brought suit against Southwestern Bell Telephone Company for trespass and declaratory relief regarding the absence of a right-of-way on the property. 116 S.W.3d at 799. The jury found that the telephone line constituted a trespass and awarded damages for Southwestern Bell's use of the property. *Id*. Our sister court stated the measure of damages when "a land owner establishes that his land has been trespassed upon and used by another" to be "actual damages in the amount of the reasonable value of the use of the portion of the land occupied by the trespasser." *Id*. at 800. Here, the measure of damages in the district court's instruction—"reasonable value for the loss of the use of Plaintiffs' properties or their property rights used by the Defendant"—conforms with the measure of damages utilized in *Hamil* to compensate the landowners for the unauthorized telephone line on their property. *See id*.

Further, even if we were to conclude that the Lehmanns' injury was permanent, the "general rule [of damages for permanent injury to land as diminution in value] should be varied so

39

as to obtain a just and equitable result when the strict adherence to the general rule would result in an outcome which would be unfair or unjust." *See B.A. Mortgage Co. v. McCullough*, 590 S.W.2d 955, 957 (Tex. Civ. App.—Fort Worth 1979, no writ). Our sister court in *McCullough* explained the rationale behind this exception:

> The rationale behind this exception is that the purpose of the general rule is to make the injured plaintiff whole where the general rule will not do so. If an unjust result will follow from the application of the general rule, the most reasonable measure of damages under the circumstances is to be used as an alternative.

*Id*.

Here, the evidence supported a different measure of damages than the general rule for permanent injury to land. If we limit the Lehmanns' damages as Etan suggests, it would result in an unjust outcome—Etan would profit from the operation of its unauthorized line and escape liability simply because there was no evidence that the line's operation resulted in a diminution in the *value* of the Hwy 77 Property. *See id.*; *see also Porras*, 675 S.W.2d at 506 (case remanded in interest of justice when no evidence that reduction in market value from permanent injury to land but evidence that might have allowed landowner to recover under different theory); *Windfohr v. Johnson's Estate*, 57 S.W.2d 215, 216 (Tex. Civ. App.—Fort Worth 1932, no writ) (measure of damages for injury to land is not "an inflexible rule" and "may be whatever comes nearest to affording actual compensation for the injury").

Whether or not the Lehmanns' injury is determined to be permanent or temporary then, we cannot conclude that the district court abused its discretion in instructing the jury that the measure of damages here was for *loss of use* of the Lehmanns' property or property rights used by

Etan. *See Hamil*, 116 S.W.3d at 800. We turn then to a review of the sufficiency of the evidence to support damages in the amount of $15,000.

*2.       Sufficiency of Evidence to Support Damages*

Etan challenges the legal and factual sufficiency of the evidence to support the damages award of $15,000. We have previously cited the standard of review for a legal sufficiency challenge. *See* discussion *supra* (citing *City of Keller*, 168 S.W.3d at 810). When considering a factual sufficiency challenge, the reviewing court considers all of the evidence and "should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Evidence supporting the damages award includes Ronald's testimony. Ronald testified that the Lehmanns received $15,000 from Qwest Communications in December 2002 for the purchase of a telecommunications easement for buried cable that Qwest had placed on the Hwy 77 Property without the Lehmanns' permission. Ronald testified that he negotiated the amount to be paid for the easement and to the "bargaining power" that he had because Qwest did not obtain the Lehmanns' permission before installing the line. Ronald further testified that the amount of

money Qwest paid to him "represents the value of the property right that [Qwest] took."[31] *See Porras*, 675 S.W.2d at 504 (property owner may opine about his property's value).

Considering all the evidence, there was evidence that supported a lower damages award. Ronald testified that he would have sold an easement to Etan for "50 bucks" had Etan asked him before installing the line on his property. Smith testified that Etan's line was shorter than the Qwest line on the property. There was also evidence that Insight paid $1 for easements that it obtained from landowners. Although this evidence would have supported a lower damages award, it was within the province of the jury to determine the Lehmanns' damages within the range of evidence presented. *See Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) (in determining damages, jury has discretion to award damages within range of evidence presented at trial).

Etan's reliance on *Hamil* is misplaced. Although the damages award was reversed and remanded for a new trial based upon factual insufficiency of the evidence, our sister court concluded that evidence from the landowner of what a buyer was willing to pay for a similar easement

---

[31] Ronald testified that he knew market values in Lee County:

Q.     . . . [B]ased upon your experience do you feel like you have a pretty good handle on what market values in Lee County are?

A.     I do.

He also testified that $15,000 represented the "fair market value of the land right that [Qwest] took from [him]" and that "I knew that [the Qwest easement] was worth at least $15,000 because if it wasn't worth that they would have taken [the line] out."

42

for the buried telephone line would have supported a lower award. 116 S.W.3d at 801, n.3.[32] Here, the damages award is supported by the landowner's testimony of what a buyer was willing to pay for a similar easement.

We conclude that the evidence was factually and legally sufficient to support the jury's finding that $15,000 would fairly and reasonably compensate the Lehmanns for Etan's actions. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176. We overrule Etan's fifth and sixth issues.[33]

---

[32] The jury in *Hamil* awarded an amount exceeding $100,000, and our sister court concluded that the evidence of what a buyer would have paid for a similar easement only supported an award of $45,000. *See Southwestern Bell Tel. Co. v. Hamil*, 116 S.W.3d 798, 801, n.3 (Tex. App.—Fort Worth 2003, no pet.).

[33] Further, even if we were to conclude that the measure of damages in the instruction was in error, Etan has failed to show how the error probably resulted in the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Goose Creek Consol. Indep. Sch. Dist. v. Jarrar's Plumbing, Inc.*, 74 S.W.3d 486, 500 (Tex. App.—Texarkana 2002, pet. denied). The jury was instructed to award damages to the Lehmanns based upon its findings of negligent misrepresentation and/or trespass. The jury was instructed that negligent misrepresentation occurs when:

a.  a party makes a representation in the course of its business or in a transaction in which it has a pecuniary interest;

b.  the representation supplies false information for the guidance of others; and

c.  the party making the representation did not exercise reasonable care or competence in obtaining or communicating the information.

A plaintiff may recover damages for the tort of negligent misrepresentation that are "necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is legal cause," including "pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation." *See Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (quoting Restatement (Second) of Torts § 552B (1977)); *see also D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663-64 (Tex. 1998) (explaining that a plaintiff can recover loss otherwise suffered as consequence of misrepresentations). Given our conclusion that the evidence supports the damages award based upon trespass, however, we need not address this

**CONCLUSION**

Having considered and overruled Etan's issues, we affirm the district court's judgment.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Waldrop and Henson
    Dissenting Opinion by Justice Waldrop

Affirmed

Filed:   March 26, 2010

---

alternative ground for upholding the damages award.