NO. 07-02-0394-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

MAY 27, 2004

_____

FLOYD DAVIS and LLOYD DAVIS,

Appellants

v.

DEVON ENERGY PRODUCTION COMPANY, L.P.,

Appellee

_____

FROM THE 121ST DISTRICT COURT OF TERRY COUNTY;

NO. 16,032; HONORABLE KELLY G. MOORE, JUDGE

_____

*Opinion*

_____

Before QUINN, REAVIS and CAMPBELL, JJ.

Floyd Davis and Lloyd Davis (the Davises) appeal from a permanent injunction entered against them and in favor of Devon Energy Production Company, L.P. (Devon). The dispute arose from the oil and gas operations by Devon on land the surface of which the Davises leased. Four points are before us. They concern whether 1) the trial court erred in failing to join the Myrtle Davis Trust as a necessary and indispensable party, 2) the evidence was legally and factually insufficient to support the trial court's finding that a 1991

letter and a 1997 letter were not enforceable agreements to which Devon was bound, 3) the evidence was legally and factually insufficient to support the finding that caliche was a reasonably necessary construction material, and 4) the evidence was legally and factually insufficient to support the finding that the Davises interfered with and unreasonably restricted Devon's right to use the surface for its oil and gas operations. We affirm the judgment.

## *Background*

Devon is a mineral lessee and operator of the North Welch Unit (Unit) near Welch, Texas. The Davises either own or lease the surface of various parcels of land within that Unit and conduct farming operations thereon. However, they own no interest in the minerals underlying the surface.

Next, the roads utilized by Devon to conduct its operations are non-compacted dirt. According to the record, they become difficult to use after it rains or the surface tenants irrigate their land. Additionally, the Davises have plowed over the lease roads at their discretion and moved them to other locations. These circumstances have led to Devon's employees and contractors being unable, at times, to locate or use the roads to access the wells, particularly when driving trucks and hauling heavy equipment or chemical treatments. Eventually, Devon proposed to make the lease roads permanent by building them with caliche. The Davises opposed this.

Devon filed suit seeking both a declaration that it had a superior right to use the surface of the land and a permanent injunction to enjoin the Davises from interfering with the exercise of Devon's rights. By judgment dated June 21, 2002, the trial court entered a judgment favorable to Devon, determined that the proposed use of the land by Devon

was reasonable and necessary and that the use of caliche as a construction material was not unreasonable, and permanently enjoined the Davises from hindering or interfering with Devon's oilfield operations, which included the construction of permanent caliche roads.

### *Point One - Joinder*

In their first issue, the Davises argue that the Myrtle Davis Trust (the Trust) was a necessary and indispensable party to the suit.[1] Thus, the trial court could not litigate the dispute without its joinder, they continue. The record illustrates that the Trust owned a portion of the surface within the Unit and leased it to the Davises. Furthermore, it was not made a party to the litigation. Nevertheless, this circumstance does not mandate reversal of the judgment, and we overrule the issue.

As a general rule, trial courts exercise broad discretion in matters of joinder. *Williamson v. Tucker,* 615 S.W.2d 881, 886 (Tex. Civ. App.–Dallas 1981, writ ref'd n.r.e.). Furthermore, a person's absence will seldom deprive a court of jurisdiction to adjudicate the rights of those who are present. *Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex. 1982).

The nature of the suit at bar was one for injunctive relief against those who attempted to interfere with the exercise by Devon of its rights under the mineral lease. Those purporting to interfere with Devon's actions, according to the record, were Lloyd and Floyd Davis, not the Trust. Thus, the Trust was not an indispensable party. *See Parr v. Merritt*, 532 S.W.2d 154, 159 (Tex. Civ. App.–Fort Worth 1976, writ ref'd n.r.e.) (holding that since Merritt sought only to enjoin Parr from obstructing a roadway, all the purported owners of the roadway were not necessary parties to the proceeding).

---

[1]Myrtle Davis is the mother of Floyd and Lloyd Davis.

3

Moreover, we perceive no need to join the Trust to completely adjudicate the legitimacy of the conduct by the Davises *viz* Devon. Again, it is the Davises who excluded Devon from the property and threatened its employees, not the Trust or its representatives. Whether they were lawfully entitled to do so does not necessitate the involvement of the Trust. And, that resolution of the dispute may have involved the declaration of rights arising from the mineral lease is of no moment since that would not prejudice the Trust. Simply put, the Trust is free to pursue its own recourse against Devon if it concludes that Devon acted improperly. The prior adjudication rendered between the Davises and Devon will not bar or otherwise prejudice that. TEX. CIV. PRAC. & REM. CODE ANN. §37.006(a) (Vernon 1997) (stating that a declaration of rights does not prejudice the rights of a person not a party to the proceedings); *Davis v. Weatherston*, No. 04-00-0533-CV, 2002 Tex. App. LEXIS 3194 (Tex. App.–San Antonio, May 8, 2002, no pet.) (not designated for publication) (holding that since a declaration of rights would not affect one not made a party to the suit, the trial court's jurisdiction was not compromised).

Given the foregoing, we must conclude that the trial court did not abuse its discretion in rejecting the Davises' complaint about the absence of the Trust. So, we overrule the issue.

### Point Two - The 1991 and 1997 Agreements

In their second point, the Davises contended that 1) Devon entered into two agreements which prohibited the use of caliche on the roads, 2) Devon is bound by those agreements, and 3) the evidence is legally and factually insufficient to support the finding that it is not. We overrule the point.

4

The construction or interpretation of a document is a question of law. *Elliot-Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999); *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.–Amarillo 2000, no pet).  Thus, it follows that the extent of an obligation, if any, imposed by a contract is also a question of law since it is obviously dependent upon the interpretation of the contract.  And, unless its terms are ambiguous, we look only to the words of the instrument to assess what it means and the extent of the obligations imposed, if any. *National Union Fire Ins. Co. v. CBI Industries, Inc.,* 907 S.W.2d 517, 520 (Tex. 1995).

As to the existence of an agreement prohibiting the construction of caliche roads, we turn to the letters purporting to illustrate the accord.  The first is dated June 25, 1991.  Written by Chevron U.S.A., Inc., a predecessor in interest to Devon, it is addressed to the Davises.  In it, Chevron alluded to a meeting with the Davises and stated, among other things, that the "main purpose of this letter is [to] confirm our understanding of the major operating points we discussed."  With respect to roads, Chevron said:

> Chevron has the legal right to build and maintain roads in the Unit that are reasonable for our production operations.  While the courts have stated twenty (20) foot permanent roads are "standard" we feel ten (10) foot dirt roads for our infield well operations are preferred because this will keep the roads level with the fields and will help them to drain better.  Also dirt roads will enable your cotton operations to be more economical by being able to plow over them.  Immediately after the planting is completed, you can then restore the roads.

> We also see the need for improved road maintenance by Chevron.  The roads should be passable under reasonable circumstances and enable us and our contractors to get to the wells without having to drive out of the road beds and on to your crops.  Your offering to provide us with surplus road building materials is greatly appreciated for the areas that are currently in need of greatest repair.

5

As can be seen, this provision said nothing about "caliche" or the construction of "caliche roads." Nor did the words used, when given their plain meaning, expressly illustrate an agreement to forego building caliche roads. At best, they evinced Chevron's desire for ten foot dirt roads. But, that it may have "preferred" building dirt roads of that size falls short of a promise to only construct roads of that size and type in perpetuity.[2] This is especially so given the lack of words which can reasonably be read as a promise by Chevron to restrict itself to a particular type road.

In short, that one may "prefer" coffee over tea does not mean he can never drink tea. Similarly, that Chevron may "prefer" narrow dirt roads does not alone contractually bar it ( or its successors) from building wider permanent roads out of caliche. At the very least, nothing in the June 1991 letter evinces an intent to so restrict the company.

The second letter mentioned is dated May 21, 1997, and was sent to the Davises by Pennzoil Exploration and Production Company, another predecessor in interest to Devon. Furthermore, it dealt with the actions of contractors appearing on the land to perform work for the company. And, like the 1991 missive, it too said nothing about the use of caliche or making caliche roads. Nor did it even address the matter of building roads. Given this, we cannot read into the document a subject not addressed or intent not described therein. *Cross Timbers Oil Co. v. Exxon Corp*, 22 S.W.3d at 26-27.

There being no agreement prohibiting the use of caliche roads, we need not determine whether Devon was bound by them. Nor need we address the topics of legal and factual sufficiency raised by the Davises.

---

[2]We assume, *arguendo*, that caliche roads fall outside the category of dirt roads. The letter does not address that.

### *Point Three - Use of Caliche*

Via their third point, the Davises question the sufficiency of the evidence to support the trial court's finding that the use of caliche was reasonably necessary. We overrule the point.

It is clear that the right to minerals in place carries with it the rights to enter and extract them and all other incidents thereto as are necessary to the enjoyment of those rights. *Tarrant County Water Control & Improvement Dist. v. Haupt*, 854 S.W.2d 909, 911 (Tex. 1993). In other words, the lessee of a mineral lease has the right to use as much of the premises in such a manner as is reasonably necessary to effectuate the purpose of the lease. *Ball v. Dillard*, 602 S.W.2d 521, 523 (Tex. 1980). Yet, our Supreme Court has seen fit to protect the owners of the surface estate to some extent. And, the protection invoked by the Davises on appeal was first enunciated in *Getty Oil Co. v. Jones*, 470 S.W.2d 618 (Tex. 1971). Recognizing that the lessee may use as much of the premises as is reasonably necessary to produce and remove the minerals, the Court nonetheless held that the lessee must exercise its right with due regard for the rights of the servient estate, *i.e.* the surface owner. *Id.* at 621. This concept has come to be known as the accommodation or alternative means doctrine. *Tarrant County Water Control & Improvement Dist. v. Haupt*, 854 S.W.2d at 911. And, in applying it, the Supreme Court stated that when there is an existing use of the land's surface by the surface owner which would be precluded or impaired, and when under established practices in the industry there are alternatives available to the lessee whereby minerals can be recovered, the circumstances "may require the adoption of an alternative by the lessee." *Id.* at 911, *quoting Getty Oil Co. v. Jones*, *supra.* Yet, this right of accommodation is dependent upon the evidence and findings by

7

the trier of fact. *Id.* That is, whether the elements for accommodation have been established is a question of fact determined by the evidence presented to the trier of fact.

Furthermore, in explaining the doctrine in *Getty*, the Supreme Court viewed it as an extension of another holding it had previously made. That holding appeared in *Acker v. Guinn*, 464 S.W.2d 348 (Tex. 1971). There, the Court discussed the nature of the estates created by the execution of a mineral lease. While doing so, it noted that while the owner of the lease acquires the dominant estate and the right to make reasonable use of the surface, "[i]t is not ordinarily contemplated . . . that the utility of the surface for agricultural or grazing purposes will be destroyed or substantially impaired." *Id.* at 352. And, it is the language we quote that the Court in *Getty* deemed instructive. *Getty Oil Co. v. Jones*, 470 S.W.2d at 621-22. It indicated the need for a "due regard" of the surface owner's interests and helped define what to consider in determining whether a surface use by the lessee is reasonably necessary. *Id.*

We too find that language instructive in assessing the scope of the accommodation doctrine. And, the words found particularly instructive are those suggesting it is not contemplated that the surface will be used by the lessee in a manner that "destroyed or *substantially* impaired" its agricultural use. (Emphasis added). Together, they connote the need for something more than slight interference. Indeed, we gather from their use that not every impairment to the surface owner's utilization of the surface is enough. Rather, only when the conduct of the lessee destroys or substantially impairs the surface owner's use of the surface does the question arise as to whether that conduct is reasonably necessary. Given this and the fact that the Supreme Court relied on *Acker* in deriving the alternative

8

means doctrine, it is reasonable to infer that the latter must apply only when the impairment experienced by the surface owner is, at the very least, substantial. With this said, we turn to the dispute before us.

Appearing in the record is evidence that 1) at one time, roads in a portion of the Unit and on the Davises' property had been caliche but had fallen in disrepair, 2) the current lease roads were not compacted because the Davises frequently plowed them up, 3) the roads were often just two tire tracks down a field, 4) the Davises' circular irrigation system, which was not in use at the time oil and gas operations commenced on the property, kept the roads muddy during the irrigation season, 5) the irrigation season approximated 180 days a year, 6) if a vehicle was unable to travel down a road, it would have to back up sometimes as much as a quarter of a mile to turn around, 7) trucks or heavy equipment were needed to service, drill and operate the wells, 8) sometimes those trucks and equipment had to be pulled out with a bulldozer, 9) lease operators who checked the wells for leaks or problems sometimes had to walk to a well location because the roads were impassable, 10) in a three month period, 248 proposed well treatments were cancelled because roads did not allow passage to the wells, 11) on one vehicle, the brakes had to be replaced six times in the first 32,000 miles due to the sandy and muddy roads, 12) during a safety drill, an emergency vehicle could not access the well location due to the Davises having plowed across the road, 13) **usual and customary industry standards dictate the need for an "all weather road" to access well sites, 14) one expert was surprised by the lack of "a decent all weather road [at the Unit] that would allow the operator . . . to conduct [its] business and have access to the well and batteries," 15)**

9

**an operator needs access via "all weather roads, and that means caliche," 16) an operator has "got to have caliche pads to set equipment," 17) "[i]t's going to be extremely difficult to operate this unit [via secondary and tertiary recovery] going forward with increased technology, increased activity without having all weather roads and pads," and 18)** the Davises used caliche around their house and to build a ramp to facilitate the operation of the irrigation system. So too was there evidence that the caliche would not cause the Davises a problem as long as they kept their plow out of it, that while Floyd Davis may not be able to always keep his plow out of the caliche, a farmer could pick up his plow behind his tractor to avoid plowing caliche into his field, that the Davises, if they so choose, could probably avoid plowing into a caliche road, that caliche rock could be crushed to smaller, less troublesome sizes, that caliche appears naturally under certain portions of the Davis farm, and that plowing in the past has brought some of this naturally appearing caliche to the surface.

The foregoing constitutes some evidence supporting the factfinder's conclusion that Devon's "use and proposed use [*i.e.*, building permanent caliche roads] of the Property is reasonable and necessary. . ." and that the use of caliche as a road building material "is not unreasonable." And, upon considering the totality of the evidence, we cannot say that the determination is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex 1986), *overruled on other grounds by Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000) (discussing the standard of review applicable when assessing whether a finding is supported by factually sufficient evidence).

10

As to the Davises' claim regarding the accommodation doctrine, we are cited to no evidence indicating that construction of permanent caliche roads would destroy their ability to conduct a profitable farming operation.[3]   And, though there exists some evidence suggesting that caliche may cause them problems, the trial court could have reasonably concluded, from the record before it, that any impairment had an insubstantial impact on the farming operations.  Furthermore, such a finding would enjoy the support of both legally and factually sufficient evidence.

### Point Four - Interference with Mineral Production

Via their fourth and final issue, the Davises argue that the evidence was legally and factually insufficient to support the trial court's finding that they interfered with Devon's production of minerals.  We overrule the issue.

According to the record, the trial court found that the Davises had "unreasonably restricted Plaintiff's rights of ingress and egress to the Property," "unreasonably restricted Plaintiff's reasonable and necessary use of the surface of the Property," and "unreasonably restricted Plaintiff from its full use of the Property."  These findings are supported by the following evidence:  1) Floyd Davis stopped a contract crew on March 16, 2001, told them they could not work, and the crew left the property; 2) on another occasion, Floyd Davis threatened to "whip" a Devon employee; 3) Lloyd Davis ordered the same Devon employee off his property on a separate occasion while clutching a ballpeen hammer; 4) Floyd Davis

---

[3]We assume, *arguendo,* that the issue was preserved for appeal.  The record does not disclose whether the Davises requested the trial court to make any particular findings on the matter, though the topic is broached on appeal.  Nor do the findings actually entered by the court expressly address the accommodation doctrine.  *See Eberts v. Businesspeople Personnel Serv., Inc.*, 620 S.W.2d 861, 862 (Tex. Civ. App.–Dallas 1981, no writ) (holding that defense urged on appeal was waived because the trial court did not address it in its findings and the defendant failed to request additional findings).

11

told another Devon employee that he was willing to die for his farm and asked if the employee was willing to die for his company; 5) Floyd Davis cursed at Devon's employees and contractors; 6) the Davises told Devon that they will not allow Devon to use caliche for roads; 7) Floyd Davis would not allow a contractor's employee, who had driven his vehicle off the lease road to go around Davis's vehicle, to leave the premises and called the sheriff; 8) Floyd Davis testified he would continue to exercise his right to instruct Devon's employees and contractors about what to do on his land and that there would be "trouble" if caliche was used on his farm; and 9) Floyd Davis testified that he would continue to plow over the lease roads. This is both legally and factually sufficient evidence to support the trial court's findings.

As to the contention that the Davises could not have unreasonably interfered with Devon's use of the property because they were only attempting to enforce the 1991 and 1997 agreements, we previously determined that no such agreements existed regarding the construction of permanent caliche roads. Thus, the documents cannot be used to justify the Davises' actions.

Having overruled each issue, the judgment of the trial court is affirmed.


Brian Quinn
Justice


12