TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00425-CV






SWEPI LP, Appellant


v.


Railroad Commission of Texas and Hidalgo County, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT

NO. D-1-GN-06-003322, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING





O P I N I O N



 SWEPI LP appeals from the district court's judgment affirming final orders of
appellee the Railroad Commission of Texas and granting the Commission's plea to the jurisdiction
on SWEPI's declaratory claims. (1) In its final orders, the Commission approved two applications for
"qualified subdivisions" pursuant to chapter 92 of the natural resources code and the Commission's
companion rule 76. See Tex. Nat. Res. Code Ann. §§ 92.001-.007 (West 2001) ("chapter 92");
16 Tex. Admin. Code § 3.76 (2009) (Tex. R.R. Comm'n, Commission Approval of Plats for Mineral
Development) ("rule 76"). Because we conclude that the district court did not err in affirming
the Commission's final orders and granting its plea to the jurisdiction, we affirm the district
court's judgment.

BACKGROUND


Chapter 92 and Rule 76


 We begin by providing a brief overview of the relevant statutory scheme and common
law to give context to the parties' arguments. Under the common law, the mineral estate is
dominant, and a mineral estate owner's right to develop includes an implied right to use the surface
estate in ways reasonably necessary to carry out its operations as long as the operations are consistent
with the common law requirement to reasonably accommodate the current uses of the surface. 
See Getty Oil Co. v. Jones, 470 S.W.2d 618, 621 (Tex. 1971); Texas Genco, LP v. Valence
Operating Co., 187 S.W.3d 118, 121-22 (Tex. App.--Waco 2006, pet. denied) (discussion of
"accommodation doctrine"); Davis v. Devon Energy Prod. Co., 136 S.W.3d 419, 423-24 (Tex.
App.--Amarillo 2004, no pet.) (discussion of common law balance between the mineral and surface
estates of the use of the surface and the accommodation doctrine). 

 In 1983, the Texas Legislature enacted chapter 92. See Tex. Nat. Res. Code Ann.
§§ 92.001-.007 ("Mineral Use of Subdivided Land"). Chapter 92 provides a statutorily granted
exception to the common law. It provides a procedure for owners of surface estates to limit mineral
estate owners' use of the surface based upon the surface's future development, delegating
administration of the procedure to the Commission. See id. § 92.004. The commission has
jurisdiction over oil and gas wells in Texas and persons owning or engaged in drilling or operating
oil and gas wells in Texas. See id. § 81.051 (West 2001) ("Jurisdiction of Commission").

 Section 92.003 provides that "surface owners of a parcel of land may create a
qualified subdivision on the land if a plat of the subdivision has been approved by the railroad
commission and filed with the clerk of the county in which the subdivision is to be located." See id.
§ 92.003. Section 92.002(3) defines a "qualified subdivision" as follows:


 (3) "Qualified subdivision" means a tract of land of not more than 640 acres:


 (A) that is located in a county having a population in excess of 400,000,
or in a county having a population in excess of 140,000 that borders
a county having a population in excess of 400,000 or located on a
barrier island;


 (B) that has been subdivided in a manner authorized by law by the surface
owners for residential, commercial, or industrial use; and


 (C) that contains an operations site for each separate 80 acres within the
640-acre tract and provisions for road and pipeline easements to allow
use of the operations site.



Id. § 92.002(3). 

 Within an approved qualified subdivision, the mineral estate owner's use of the
surface is limited to "designated operations sites for exploration, development, and production of
minerals and the designated easements only as necessary to adequately use the operations sites." Id.
§ 92.005. "'Operations site' means a surface area of two or more acres located in whole or in part
within a qualified subdivision, designated on the subdivision plat, that an owner of a possessory
mineral interest may use to explore for and produce minerals." Id. § 92.002(1). (2) An application to
create a qualified subdivision "must be accompanied by a plat of the subdivision showing the
applicant's proposed location of operations sites and road and pipeline easements." Id. § 92.004(a). 

 After notice to the applicant and owners of possessory mineral interests, the
Commission must hold a hearing on the application to "consider the adequacy of the number and
location of operations sites and road and pipeline easements." See id. § 92.004(b). "After
considering the evidence, the commission shall approve, reject, or amend the application to ensure
that the mineral resources of the subdivision are fully and effectively exploited." Id. An applicant
or owner of a possessory mineral interest may appeal the Commission's order "as provided by law." 
Id.; see also Tex. Gov't Code Ann. § 2001.171 (West 2008) (judicial review of state
agency decisions).

 The Commission adopted rule 76 to implement chapter 92. See 16 Tex. Admin. Code
§ 3.76; see also Tex. Nat. Res. Code Ann. § 92.004(a) (commission charged with adopting rules). 
The subsections of rule 76 at issue substantively track the language in the corresponding sections in
chapter 92. With this context, we turn to the parties' dispute. 


The Controversy


 In 2004, Betty Eyhorn acquired the surface estate of 1,280 contiguous acres of
dry farm land in Hidalgo County. Boston Texas Land and Trust owns the mineral estate of the
1,280 acres, and SWEPI is the owner and operator of an oil and gas lease with Boston Texas Land
and Trust that encompassed this acreage. SWEPI has operational wells producing gas on portions
of the acreage.

 In 2006, Eyhorn recorded plats in the real property records of Hidalgo County (3) and
filed two applications accompanied by the recorded plats with the Commission for "qualified
subdivisions" of 640 acres each on her land. See Tex. Nat. Res. Code Ann. §§ 92.002(3), .004;
16 Tex. Admin. Code § 3.76(a)(4), (c). The plats show proposed locations for oil and gas operations
sites and road and pipeline easements. See Tex. Nat. Res. Code Ann. § 92.004(a); 16 Tex. Admin.
Code § 3.76(c)(4). At that time, Hidalgo County had an option to purchase the 1,280 acres from
Eyhorn and planned to use the acreage for constructing and operating a landfill. The Commission
notified SWEPI as an owner of possessory mineral interests, and SWEPI opposed approval of both
applications. See Tex. Nat. Res. Code Ann. § 92.004(b); 16 Tex. Admin. Code § 3.76(d). The
two applications were considered in consolidated hearings. (4) 

 In September 2006, SWEPI filed this cause, requesting that the district court enjoin
the Commission from holding the hearings because the Commission did not have authority to
approve the applications. After a hearing, the district court denied SWEPI's request and abated this
cause until the Commission entered its final orders. (5) 

 The consolidated hearings were resumed and heard on January 21 and February 22,
2007. (6) The hearing examiners issued a proposal for decision on November 1, 2007, recommending
approval of both applications. The evidence was then reopened in January 2008 to receive evidence
of a new well that SWEPI drilled after the proposal for decision was issued. The new well was at
a surface location outside of the proposed operations sites on one of the subdivisions. Eyhorn
provided a revised plat for that subdivision which was admitted into the record. The revised plat
provided an additional operations site around the location of the new well.

 The hearing examiners thereafter issued an amended proposal for decision, addressing
the new well and continuing to recommend approval of both applications. In February 2008, the
Commission adopted and incorporated the examiners' conclusions of law and relevant findings of
fact and entered separate final orders approving the two applications. The final order for each
qualified subdivision attached and incorporated a metes and bounds description of the subdivision
and the revised plat depicting the location of the oil and gas operations sites and easements. SWEPI
filed a motion for rehearing on both applications, which motions the Commission overruled. 

 In May 2008, SWEPI filed an amended petition in this cause, seeking judicial review
of the Commission's final orders under the Texas Administrative Procedure Act. See Tex. Gov't
Code Ann. §§ 2001.001-.902 (West 2008 & Supp. 2009) (the "APA"). SWEPI also sought
declarations that the Commission's final orders were in excess of the Commission's statutory
authority and interfered with and impaired a legal right or privilege of SWEPI or, in the alternative,
declarations construing SWEPI's rights under the Commission's final orders. See id. § 2001.038
(West 2008); Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008) (Texas Uniform
Declaratory Judgments Act) (the "Act"). After Eyhorn sold her land to Hidalgo County, Hidalgo
County intervened and Eyhorn withdrew as a party to this cause. 

 In March 2009, the Commission filed a plea to the jurisdiction on SWEPI's claims
for declaratory relief and, in April 2009, the district court held a hearing on the administrative appeal
and the Commission's plea to the jurisdiction. Following the hearing, the district court affirmed the
Commission's final orders and granted its plea to the jurisdiction. This appeal followed.


ANALYSIS


 In five issues, SWEPI contends that the district court erred by affirming the
Commission's final orders and by granting the Commission's plea to the jurisdiction. SWEPI urges
that the Commission exceeded its statutory authority because chapter 92's plain language does not
authorize the Commission to consider or approve two contiguous 640-acre qualified subdivisions
on a single parcel of land for the single purpose of landfill operations. As to its declaratory claims,
SWEPI contends that the district court had jurisdiction to interpret chapter 92 and rule 76 or, in the
alternative, to declare SWEPI's rights under the Commission's final orders.


Administrative Appeal of Commission's Final Orders


 In its first three issues, SWEPI challenges the Commission's final orders under the
APA. SWEPI urges that the Commission acted outside of its authority by approving Eyhorn's
applications of two contiguous 640 acres for the "same development on a single parcel of land." 
SWEPI also urges that the Commission acted outside its authority by approving the subdivisions
because they "had not been subdivided for 'residential, commercial or industrial use'" but for
Hidalgo County to construct and operate a landfill. SWEPI further urges that the Commission
improperly interpreted and applied rule 76 in a manner that interferes with or impairs a legal right
or privilege of SWEPI.


 A) Scope and Standard of Review


 We may reverse a state administrative agency's decision that prejudices substantial
rights of the complaining party if the decision is in violation of a constitutional or statutory
provision, in excess of the agency's authority, made through unlawful procedure or affected by other
error of law, not reasonably supported by substantial evidence, or arbitrary or capricious or
characterized by an abuse of discretion. Tex. Gov't Code Ann. § 2001.174(2)(A)-(F) (West 2008);
Railroad Comm'n v. Torch Operating Co., 912 S.W.2d 790, 792-93 (Tex. 1995). SWEPI limits its
challenge to the Commission's authority to consider and approve the final orders. See id.
§ 2001.174(2)(B).

 An administrative agency "has only those powers that the Legislature expressly
confers upon it" and "any implied powers that are reasonably necessary to carry out the express
responsibilities given to it by the Legislature." See Public Util. Comm'n v. City Pub. Serv. Bd.,
53 S.W.3d 310, 315 (Tex. 2001). The issue then is the scope of the Commission's authority under
chapter 92, and the starting point for construing chapter 92 is the language of the statute itself. See
In re City of Georgetown, 53 S.W.3d 328, 331 (Tex. 2001).

 We consider questions of statutory construction de novo. See City of San Antonio
v. City of Boerne, 111 S.W.3d 22, 25 (Tex. 2003). When construing a statute, our primary goal is
to determine and give effect to the legislature's intent. Id.; see also Tex. Gov't Code Ann. § 312.005
(West 2005). To determine legislative intent, we look to the statute as a whole, as opposed to
isolated provisions. City of San Antonio, 111 S.W.3d at 25 (citing State v. Gonzalez, 82 S.W.3d 322,
327 (Tex. 2002)). We begin with the plain language of the statute at issue and apply its common
meaning. Id. Where the statutory text is unambiguous, we adopt a construction supported by the
statute's plain language unless that construction would lead to an absurd result. Fleming Foods of
Tex., Inc. v. Rylander, 6 S.W.3d 278, 284 (Tex. 1999).

 We construe administrative rules in the same manner as statutes. See Rodriguez
v. Service Lloyds Ins. Co., 997 S.W.2d 248, 254 (Tex. 1999). Unless the rule is ambiguous, we
follow the rule's plain language, and our primary objective is to give effect to the agency's intent. 
See id. For this reason, we give deference to an agency's interpretation of its own rules unless that
interpretation is clearly erroneous or contrary to the plain language of the rule. See Public Util.
Comm'n v. Gulf States Utils. Co., 809 S.W.2d 201, 207 (Tex. 1991); Cities of Dickinson v. Public
Util. Comm'n, 284 S.W.3d 449, 453 (Tex. App.--Austin 2009, no pet.).

 

 B) 640-acre Limit for a Qualified Subdivision


 In its first two issues, SWEPI contends that the Commission exceeded its
statutory authority under chapter 92 and improperly interpreted and applied rule 76 by approving
two contiguous qualified subdivisions that are in excess of 640 acres combined on a single parcel
of land. SWEPI urges that the plain meaning of "not more than 640 acres" in the definition of
"qualified subdivision" in section 92.002(3) and rule 76(a)(4) is as a statutory cap or "absolute limit"
on the amount of acres that can be approved as a qualified subdivision on a single parcel of land. 
See Tex. Nat. Res. Code § 92.002(3); 16 Tex. Admin. Code § 3.76(a)(4). SWEPI focuses on the use
of the indefinite article "a" in the definition of "qualified subdivision" in the statute and the rule--"a
tract of land of not more than 640 acres"--and in the phrase in section 92.003 that "[t]he surface
owners of a parcel of land may create a qualified subdivision on the land . . . ." See Tex. Nat. Res.
Code Ann. §§ 92.002(3), .003; 16 Tex. Admin. Code § 3.76(a)(4) (emphasis added). (7) Based upon
the use of "a" in the phrases "a tract of land of not more than 640 acres," "a parcel of land," and "a
qualified subdivision," SWEPI contends that the plain meaning of this language only supports
a single 640-acre qualified subdivision per parcel of land. SWEPI argues that to construe chapter
92 and rule 76 to authorize the Commission to approve multiple applications for contiguous
qualified subdivisions on a single piece of property, as long as no single application exceeds
640 acres, would give no meaning to the inclusion of "no more than 640 acres." See City of
San Antonio, 111 S.W.3d at 29 (effect must be given to each word and clause so that none are
rendered meaningless); see also Tex. Gov't Code Ann. § 311.021(2) (West 2005) ("[T]he entire
statute is intended to be effective.").

 The Commission's interpretation of chapter 92 and rule 76, however, conforms with
the common meaning of the language in both the statute and rule. In drafting statutes, the singular
tense includes the plural and the plural tense includes the singular "unless expressly provided
otherwise." Tex. Gov't Code Ann. § 312.003(b) (West 2005); see id. § 311.012(b) (West 2005)
("The singular includes the plural and the plural includes the singular."); Frenship Rural High Sch.
Dist. v. Central Educ. Agency, 404 S.W.2d 41, 43-44 (Tex. Civ. App.--Austin 1966, writ ref'd
n.r.e.) (discussing and applying rule that singular includes plural). Here, the legislature did not
provide otherwise. 

 Although the legislature limited a qualified subdivision to "a tract of land of not more
than 640 acres," the legislature did not expressly provide that only one 640-acre qualified subdivision
was authorized for a landowner of more than 640 acres. Nor did the legislature expressly require the
Commission to consider applications for qualified subdivisions based upon their relation to other
proposed subdivisions, such as joint proposed development and relative locations. "Only when it
is necessary to give effect to the clear legislative intent can we insert additional words or
requirements into a statutory provision." Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 540
(Tex. 1981); see City of Rockwall v. Hughes, 246 S.W.3d 621, 629 (Tex. 2008) (declining to read
additional words into statute in construing statute). 

 In contrast to the Commission's interpretation, SWEPI's proposed interpretation
would require this Court to add additional requirements to the statute that are not contained in its
plain language. See Cameron, 618 S.W.2d at 540. We would have to add requirements that would
limit a landowner of more than 640 acres to one qualified subdivision on her land even if she
planned to develop her entire tract for the same purpose. If the legislature had intended to place such
restrictions on qualified subdivisions, it could have written such restrictions into the statute. See id.;
see also Presidio Indep. Sch. Dist. v. Scott, No. 08-0958, slip op. at 7 (Tex. April 23, 2010),
available at http://www.supreme.courts.state.tx.us/historical/2010/apr/080958.pdf ("Courts must not
give the words used by the Legislature an 'exaggerated, forced, or constrained meaning.'" (quoting
City of Austin v. Southwestern Bell Tel. Co., 92 S.W.3d 434, 442 (Tex. 2002)). Likewise, if the
legislature had intended to effect a cap, it would likely have said so. We may not presume that when
the legislature chooses, it opts for opacity. The purpose of the law shall not be sacrificed to a literal
interpretation of the article "a."

 The Commission's interpretation of chapter 92 and rule 76 also conforms with the
title and stated purpose of chapter 92. See Tex. Gov't Code Ann. § 311.023(1), (7) (West 2005)
(when construing a statute whether or not ambiguous on its face, courts may consider the "object
sought to be obtained" and "title"); McIntyre v. Ramirez, 109 S.W.3d 741, 745 (Tex. 2003). Chapter
92 is entitled "Mineral Use of Subdivided Land." "Subdivide" commonly means "to further divide
(what has already been divided)." Webster's Third New International Dictionary 2274 (2002). 
Section 92.001 states the legislative purpose behind the enactment of chapter 92:


 It is the finding of the legislature that the rapidly expanding population and
development of the cities and towns of this state and the concomitant need for
adequate and affordable housing and suitable job opportunities call for full and
efficient utilization and development of all the land resources of this state, as well as
the full development of all the minerals of this state. In view of that finding, it is the
intent of the legislature that the mineral resources of this state be fully and effectively
exploited and that all land in this state be maintained and utilized to its fullest and
most efficient use. It is the further finding of this legislature that it is necessary to
exercise the authority of the legislature pursuant to Article XVI, Section 59, of the
Constitution of the State of Texas to assure proper and orderly development of both
the mineral and land resources of this state and that the enactment of this chapter will
protect the rights and welfare of the citizens of this state.


Tex. Nat. Res. Code Ann. § 92.001 (italics added). The Commission's interpretation is consistent
with the plain language of the title and the stated purpose that the legislature intended to address the
mineral use of land that has been subdivided and to maximize the development of both the surface
and the mineral resources on the subdivided land. Id.

 As the hearing examiners explain in the amended proposal for decision concerning
the legislature's intent in enacting chapter 92,


 Considering that the stated purpose of the enactment of Chapter 92 of the Code was
to achieve full and efficient utilization and development of all the land resources of
the state, as well as full development of the minerals of the state, it appears to the
examiners implausible that it was intended that the surface owner of a 1,280-acre
housing or mixed use development, for example, [would] be prohibited from
obtaining the protections of § 92.005 for more than 50% of his development. The
definition in § 92.002(3) suggests that the Commission may not approve a distinct
subdivision containing more than 640 acres, but it does not expressly forbid approval
of two contiguous 640-acre subdivisions created out of a single parcel of contiguous
acreage. A more plausible interpretation is that the 640-acre limitation in the
definition of "qualified subdivision" was intended to require the surface owner to
reserve operations sites and road and pipeline easements for each distinct 640 acres
or less and to require independent analysis by the Railroad Commission of the
adequacy of such operations sites and easements for the full and efficient exploitation
of mineral resources for each distinct 640 acres or less.



The Commission's interpretation to allow contiguous qualified subdivisions that exceed 640 acres
combined for a single proposed development satisfies the legislative intent to balance the competing
interests between the surface and mineral estates and serves the legislative intent "that all land in this
state be maintained and utilized to its fullest and most efficient use." Id. (emphasis added).

 Chapter 92 as a whole also supports the Commission's interpretation of the statute
and its rule that allows contiguous qualified subdivisions that exceed 640 acres combined for a
single proposed development. See City of San Antonio, 111 S.W.3d at 25. Chapter 92 balances the
future development of the surface estate against the subsurface mineral resources by requiring the
Commission independently to consider the "adequacy of the number and location of operations sites
and road and pipeline easements" for each distinct application and by providing minimum
requirements for the size and location of the operations sites. See Tex. Nat. Res. Code Ann.
§ 92.004(b). Each operations site must have at least two acres and each separate 80 acres must have
at least one operations site. See id. § 92.002(1), (3)(C); 16 Tex. Admin. Code § 3.76(a)(2), (4)(C). 
Additionally, after considering the evidence, the Commission must "approve, reject or amend the
application to ensure that the mineral resources of the subdivision are fully and effectively
exploited." See Tex. Nat. Res. Code Ann. § 92.004(b); 16 Tex. Admin. Code § 3.76(d). Chapter
92 ensures that the interests of owners of possessory mineral interests are protected for each distinct
qualified subdivision that the Commission approves.

 The Commission's interpretation of chapter 92 and rule 76 is reasonable and
consistent with the legislative history of chapter 92. See Tarrant Appraisal Dist. v. Moore,
845 S.W.2d 820, 823 (Tex. 1993) ("Construction of a statute by the administrative agency charged
with its enforcement is entitled to serious consideration, so long as the construction is reasonable and
does not contradict the plain language of the statute."); Public Util. Comm'n, 809 S.W.2d at 207;
Railroad Comm'n v. Coppock, 215 S.W.3d 559, 563 (Tex. App.--Austin 2007, pet. denied); see also
Tex. Gov't Code Ann. § 311.023(3), (6) (West 2005) (whether or not statute ambiguous, court may
consider administrative construction of statute and legislative history). (8) The legislative history is
silent on any intent to place an absolute limit on the number of contiguous qualified subdivision
applications that the Commission could consider and approve or the number of applications that a
single property owner could file and have approved for a proposed development based upon an
absolute limit or statutory cap of acreage.

 SWEPI relies upon the amendment in 1987 to section 92.002(3) that increased the
acreage for a qualified subdivision from 160 to 640 acres. See Act of June 11, 1987, 70th Leg., R.S.,
ch. 274, § 1, 1987 Tex. Gen. Laws 1616, 1616. (9) SWEPI contends that the Commission's
interpretation makes the amendment from 160 to 640 acres meaningless because, without the
amendment, a party could have filed four applications to reach 640 acres of qualified subdivisions. 
Increasing the size for qualified subdivisions to 640 acres, however, provides certainty and
protection for the parties and promotes efficiency by reducing the number of applications required
for larger developments. (10) 

 Moreover, were we to accept SWEPI's interpretation of the language in chapter 92
and rule 76, such an interpretation would lead to absurd results. Rylander, 6 S.W.3d at 284. For
example, an owner of a 1,000-acre property that the owner wanted to develop as a residential
subdivision would be limited to an area of 640 acres for qualified subdivisions, without any
consideration or balancing between the competing interests of the mineral and surface estates and
the "fullest and most efficient use" of the 1,000 acres. See Tex. Nat. Res. Code Ann. § 92.001; see
also Tex. Gov't Code Ann. § 311.023(5) (West 2005) (whether or not statute ambiguous, court may
consider "consequences of a particular construction"); Scott, slip op. at 7 (court must not give words
"exaggerated, forced, or constrained meaning").

 SWEPI analogizes Eyhorn's two contiguous applications that exceeded 640 acres
combined to plaintiffs who attempt to "escape the Legislature's statutory scheme by artful pleading." 
See Murphy v. Russell, 167 S.W.3d 835, 838-39 (Tex. 2005) (plaintiff's claim of battery dismissed
because substance was medical malpractice claim and, therefore, statutorily required to file expert
report); see also In re Merrill Lynch Trust Co. FSB, 235 S.W.3d 185, 190 (Tex. 2007) (orig.
proceeding) ("[A]rbitrability turns on the substance of a claim, not artful pleading."); Baylor Univ.
v. Sonnichsen 221 S.W.3d 632, 636 (Tex. 2007) (focus of "legal treatment of claims [is] on the true
nature of disputes rather than allow artful pleading to morph contract claims into fraud causes of
action to gain favorable redress under the law"). We do not find these cases analogous as they focus
on a plaintiff's improper re-characterization of a cause of action into a different cause of action. In
contrast, Eyhorn complied with the procedures in chapter 92 and rule 76 by filing two separate
applications for 640 acres, and she fully informed the Commission and SWEPI of Hidalgo County's
option to buy her land and its plans for developing the two contiguous subdivisions. 

 Consistent with the powers that the legislature expressly conferred on it, the
Commission independently analyzed Eyhorn's applications, considered the adequacy of the proposed
operations sites and easements for each proposed qualified subdivision, and determined that the
minerals would be "fully and effectively exploited" on the land comprising the two distinct
subdivisions. See Tex. Nat. Res. Code Ann. §§ 92.001, .004(b); 16 Tex. Admin. Code § 3.76(d);
Public Util. Comm'n, 53 S.W.3d at 315. (11) Applying the plain language of chapter 92 and rule 76,
we conclude that the Commission did not exceed its statutory authority under chapter 92 and did not
misinterpret or misapply rule 76 by approving the two separate applications for 640 acres each in its
final orders. (12)
 We overrule SWEPI's first and second issues.


 C) Landfill as "Industrial" Use


 In its third issue, SWEPI contends that the Commission exceeded its statutory
authority by approving the applications because Eyhorn's land was not "subdivided in a manner
authorized by law by the surface owners for residential, commercial, or industrial use." See Tex.
Nat. Res. Code Ann. § 92.002(3)(B); 16 Tex. Admin. Code § 3.76(a)(4)(B); see also Tex. Gov't
Code Ann. § 2001.174(2)(B). (13) SWEPI specifically urges that the proposed use of a landfill is not
an "industrial use" within that term's common meaning. 

 SWEPI challenges the Commission's adoption of the hearing examiners' finding of
fact number 6 and conclusions of law numbers 2 and 3:


 6. Each of the proposed qualified subdivisions has been subdivided in a manner
authorized by law by the surface owner for industrial use.


 a. Eyhorn is the owner of the surface estate of the acreage included in
each of the proposed qualified subdivisions.


 b. Eyhorn has filed plats of each of the proposed qualified subdivisions
with the Railroad Commission showing subdivided lots and the
proposed locations of operations sites for exploration, development,
and production of minerals and road and pipeline easements
necessary to use the operations sites.


 c. Under Hidalgo County subdivision rules, approval of the
Commissioner's Court of Hidalgo County of qualified subdivision
plats is not required prior to Railroad Commission approval. Under
these subdivision rules, a parcel of land is considered subdivided for
residential, commercial, or industrial use when a plat delineating tract
boundaries, oil and gas operations sites, pipeline easements, road
easements or other boundaries is filed with the Railroad Commission
as a part of an application for approval of a qualified subdivision.


 d. The acreage covered by the two proposed qualified subdivisions is
subject to an option to purchase contract between Eyhorn, as current
surface owner, and Hidalgo County, as purchaser.

 

 e. Hidalgo County proposes to use each of the proposed qualified
subdivisions for a landfill and associated landfill facilities.


* * *


 2. All things necessary to the Commission attaining jurisdiction over the subject
matter and the parties in these dockets have been performed or have occurred.


 3. Each of the applications for approval of qualified subdivisions in these
dockets meets and complies with all requirements for approval of Chapter
92 of the Texas Natural Resources Code and Railroad Commission Statewide
Rule 76.



 SWEPI urges that the legislature did not intend landfill operations as the type of use
it was trying to protect in enacting chapter 92. SWEPI focuses on references in the legislative history
to "buildings," "developing urban areas," and "real-estate development." (14) SWEPI urges that the
"focus in adopting the statute was in reconciling the land use needs of local urban real estate
development with full and effective development of the state's mineral resources." The legislative
history, however, is silent on what constitutes an "industrial use." And the Commission's
interpretation that a landfill is an industrial use within the meaning of section 92.002(3)(B) is
reasonable and does not contradict the plain language of the statute. See Moore, 845 S.W.2d at 823;
Coppock, 215 S.W.3d at 563. The common meaning of "industrial" when used as an adjective
means "of or belonging to industry." Webster's Third New International Dictionary 1155 (2002). (15) 

 That the legislature intended for residential subdivisions or commercial or industrial
office parks to fall within the types of uses allowed under the statute does not preclude other uses,
such as landfill operations, from also falling within the types of uses allowed. Section 92.002(3)(A)
expressly defines the counties in which a qualified subdivision may be created based upon the
population of the county: the tract of land must be "located in a county having a population in excess
of 400,000, or in a county having a population in excess of 140,000 that borders a county having a
population in excess of 400,000." See Tex. Nat. Res. Code Ann. § 92.002(3)(A). (16) Other than the
population requirement, there is no expressed restriction that a qualified subdivision only be in urban
areas or for development that includes buildings. See id.; Cameron, 618 S.W.2d at 540.

 SWEPI relies upon subsection (c) of section 92.005 to support that the legislature did
not intend for a landfill to be an "industrial use." See Tex. Nat. Res. Code Ann. § 92.005(c). Section
92.005(c) provides the circumstances when the restrictions on an owner of a possessory mineral
interest in a qualified subdivision cease to apply:


 (c) This section ceases to apply to a subdivision if, by the third anniversary of the
date on which the order of the commission becomes final:


 (1) the surface owner has not commenced actual construction of roads or
utilities within the qualified subdivision; and


 (2) a lot within the qualified subdivision has not been sold to a third
party.



See id. SWEPI focuses on the requirement in subsection (c)(2) that a lot be sold to a third party to
support that the uses intended were "urban real estate development, like residential subdivisions and
commercial or industrial office parks." But the plain language of subsection (c) is that both
subsections (1) and (2) must apply for the restrictions on the owner of the possessory mineral interest
to cease. If construction of roads or utilities is commenced within three years of the order from the
Commission becoming final--whether or not a lot is sold to a third party--section 92.005(c) does
not apply. See City of San Antonio, 111 S.W.3d at 25. Section 92.005(c) does not support limiting
"industrial use" as SWEPI proposes.

 Applying the common meaning of "industrial use," we conclude that the Commission
did not exceed its statutory authority by interpreting "industrial use" to include landfill operations. (17) 
See Tex. Nat. Res. Code Ann. § 92.002(3)(B); 16 Tex. Admin. Code § 3.76(a)(4); City of
San Antonio, 111 S.W.3d at 25. We overrule SWEPI's third issue.


Declaratory Relief


 In its fourth and fifth issues, SWEPI contends that the district court erred in granting
the Commission's plea to the jurisdiction as to its declaratory claims under the Act and under section
2001.038(a) of the government code. Alternatively, SWEPI contends that the district court erred in
granting the Commission's pleas as to its alternative requests for declaratory relief concerning the
meaning of the Commission's final orders. 

 In its plea to the jurisdiction, the Commission contended that the district court did not
have jurisdiction of SWEPI's declaratory claims because those claims were redundant of its claims
challenging the Commission's final orders under section 2001.174 of the APA and that full relief
was available to SWEPI as part of its suit for judicial review of the Commission's final orders.
SWEPI urges that it pled and proved that its requests for declaratory relief did not duplicate its
administrative appeal but were broader because a decision on the administrative appeal "[did] not
necessarily settle the underlying dispute between the parties over the scope of the Commission's
authority." See Texas Mun. Power Agency v. Public Utility Comm'n, 253 S.W.3d 184, 200 (Tex.
2007) (remanding declaratory claims that are "distinct from and not duplicative of the claims for
judicial review of Commission orders").

 We review the trial court's ruling on a plea to the jurisdiction de novo. Texas Dep't
of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 228 (Tex. 2004). A plea to the jurisdiction is a
dilatory plea that contests the trial court's authority to determine the subject matter of the cause of
action without regard to whether the claims asserted have merit. Bland Indep. Sch. Dist. v. Blue,
34 S.W.3d 547, 554 (Tex. 2000). 

 Section 37.004(a) of the Act provides that a person "whose rights, status, or legal
relations are affected by a statute . . . may have determined any question of construction or validity
arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations
thereunder." Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a). Section 2001.038(a) of the
government code provides, "The validity or applicability of a rule . . . may be determined in an action
for declaratory judgment if it is alleged that the rule or its threatened application interferes with or
impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't
Code Ann. § 2001.038(a). 

 A declaratory judgment claim "will not lie" when it is "redundant" of a parallel
administrative appeal and the "remedy under the APA is the same as that provided under the
[Act]"--reversal of the agency's final order. Texas Mun. Power Agency v. Public Util. Comm'n,
260 S.W.3d 647, 651 (Tex. App.--Austin 2008, no pet.) (citing and quoting Texas Liquor Control
Bd. v. Canyon Creek Land Corp., 456 S.W.2d 891, 895 (Tex. 1970)); see also Young Chevrolet, Inc.
v. Texas Motor Vehicle Bd., 974 S.W.2d 906, 911 (Tex. App.--Austin 1998, pet. denied) ("When
a statute provides a method for attacking an agency order, a declaratory judgment action directed at
that order will not lie."); Texas Dep't of Transp. v. Texas Weekly Advocate, No. 03-09-00159-CV,
2010 Tex. App. LEXIS 566, at *8 (Tex. App.--Austin Jan. 29, 2010, no pet.) (mem. op.) ("A
[declaratory judgment] action cannot stand if there is a pending action that resolves the exact issues
raised under the [Act].") (citing and quoting Texas Liquor Control Bd., 456 S.W.2d at 895).

 Here it is clear that SWEPI's declaratory claims duplicate its claims and available
remedies under its administrative appeal of the Commission's final orders. SWEPI sought the
following declarations in its pleadings:



 Section 92.002(3) of the Code and Statewide Rule 76(a)(4) limit the
Commission's authority to consider and/or approve applications for
"qualified subdivisions" to no more than 640 acres;

 The Commission had no authority to consider or approve the Applications,
because to do so was tantamount to considering and approving a "qualified
subdivision" of more than 640 acres;

 The Commission exceeded its statutory authority and violated its own rule by
considering and approving the Applications;

 The Commission exceeded its statutory authority and violated its own rule
when it refused to dismiss the Applications upon [SWEPI]'s motion;


 


 The Commission exceeded its statutory authority and violated its own rule
when it adopted the orders . . . , effectively granting "qualified subdivision"
status to a tract of more than 640 acres; and


 


 The Commission has applied Statewide Rule 76 in a manner that interferes
with or impairs a legal right or privilege of [SWEPI].


 

* * *



 The words "residential, commercial and industrial use" as found in the
definition of "qualified subdivision" in Tex. Nat. Res. Code § 92.002(3)(B),
do not include a use as a landfill within the meaning of these terms.

 The words "residential, commercial and industrial use" as found in the
definition of "qualified subdivision" in Statewide Rule 3.76(a)(4)(B), do not
include a use as a landfill within the meaning of these terms.




 SWEPI's declaratory claims are based upon the same statutory construction
arguments that it made at the consolidated hearings before the Commission and that it made to the
district court in its administrative appeal of the Commission's final orders. An available remedy in
its administrative appeal was the reversal of the Commission's orders if the orders were "in excess
of the agency's statutory authority." See Tex. Gov't Code Ann. § 2001.174(2)(B). The district court
necessarily decided the substance of SWEPI's declaratory claims when it affirmed the Commission's
final orders--interpreting chapter 92 and rule 76 to authorize the Commission to approve Eyhorn's
two applications for contiguous qualified subdivisions of 640 acres each and for development as a
landfill. See id. SWEPI's declaratory claims would provide no additional relief. 

 SWEPI cites City of Waco v. Texas Natural Resource Conservation Commission,
83 S.W.3d 169 (Tex. App.--Austin 2002, pet. denied), to support the district court's jurisdiction to
consider its declaratory claims. We find the analysis in City of Waco inapplicable here. In that case,
this Court held that the district court had jurisdiction to consider the city's request for a declaration
that the TNRCC could not grant additional permits in a watershed area until the city complied with
federal regulations that were incorporated into state law. Id. at 173. Unlike here, the City was not
attacking an agency order or rule, and the only ground for dismissal that the TNRCC raised was one
of ripeness--"that the controversy [was] hypothetical and not ripe for adjudication apart from a
specific permit application." Id. at 178. This Court made clear that "[t]he City [was] not appealing
from a specific agency action and [was] not challenging the validity or application of an agency
rule," but rights it alleged it was afforded under federal regulation. Id. In that context, this Court
held that the district court had jurisdiction to consider the city's request for declaratory relief "on a
purely legal issue." Id. at 178. (18) 

 As to SWEPI's alternative claims for declarations of its legal rights, status, and
relations under the Commission's final orders, SWEPI contends that there is confusion surrounding
the restrictions placed on SWEPI because it is not clear if SWEPI is subject to the original plats filed
and approved by Hidalgo County or if the revised plats that the Commission approved and
incorporated into its final orders replaced the plats originally filed in Hidalgo County. SWEPI's
complaint focuses on alleged uncertainty created by Eyhorn's filing of amended plats for the
subdivisions during the pendency of the applications before the Commission and concerns that
Hidalgo County may impose restrictions on SWEPI in the future based upon the original plats. 

 Section 92.004(a) specifies that applications must be accompanied by a plat of the
subdivision showing the proposed locations of operation sites and easements. See Tex. Nat. Res.
Code Ann. § 92.004(a). But section 92.004(b) authorizes the Commission itself to amend a plat
prior to approval and section 92.006 expressly allows a surface owner to abandon, replat, or amend
any portion of a subdivision as long as the amendment or replatting is approved by the Commission. 
See id. §§ 92.004(b), .006. Section 92.006 further protects the owner of possessory mineral interests
because an amendments or replat "may not alter, diminish, or impair the usefulness of an operations
site or appurtenant road or pipeline easement unless the amendment or replat is approved by the
commission in accordance with Section 92.003 of this Code." See id. § 92.006. Here Eyhorn's
revisions to the plats were made in part to provide more surface area for SWEPI's oil and gas
operations sites and to accommodate the new well that SWEPI drilled on one of the subdivisions
during the pendency of the applications before the Commission.

 In any event, the Act may not be used to obtain an impermissible advisory opinion
to interpret the Commission's final orders. (19) See Texas Ass'n of Bus. v. Texas Air Control Bd.,
852 S.W.2d 440, 444 (Tex. 1993) (Act "merely a procedural device for deciding cases already within
a court's jurisdiction rather than a legislative enlargement of a court's power, permitting the
rendition of advisory opinions"); Alamo Express, Inc. v. Union City Transfer, 309 S.W.2d 815,
827-28 (Tex. 1958) (request for a declaratory judgment of meaning of agency order and its various
provisions seeking impermissible advisory opinion).

 We conclude that the district court did not err in granting the Commission's plea
to the jurisdiction concerning SWEPI's declaratory claims. We overrule SWEPI's fourth and
fifth issues. 


CONCLUSION


 Having overruled SWEPI's issues on appeal, we affirm the district court's judgment,
affirming the Commission's final orders and granting the Commission's plea to the jurisdiction on
SWEPI's declaratory claims.




 __________________________________________


 Jan P. Patterson, Justice


Before Justices Patterson, Puryear and Henson

 

Affirmed

 

Filed: May 11, 2010
1. See Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008) (Texas Uniform
Declaratory Judgments Act) (the "Act"); Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2008
& Supp. 2009) (Texas Administrative Procedure Act) (the "APA").
2. "'Possessory mineral interest' means a mineral interest that includes the right to use the
land surface for exploration and production of minerals." Tex. Nat. Res. Code Ann. § 92.002(2)
(West 2001).
3. The subdivision plats bear the signature of the county judge and attestation by the county
clerk that the Hidalgo County Commissioner's Court reviewed and approved the plats for the
two subdivisions in February 2006.
4. In September 2006, Eyhorn provided SWEPI and the Commission with revised plats for
both subdivisions and advised them that the revised plats would be the basis for Eyhorn's case at the
consolidated hearings. Among the revisions, these plats increased the size of the proposed oil and
gas operations sites. The revised plats designate approximately 140 acres and 139 acres for oil and
gas operations sites in the two subdivisions respectively.
5. SWEPI filed an accelerated appeal from the district court's denial of its request for
injunctive relief with this Court, but it was dismissed for want of prosecution in June 2007. SWEPI
LP v. Railroad Commission, No. 03-06-00599-CV (Tex. App.--Austin June 18, 2007) (mem. op.),
available at http://www.3rdcoa.courts.state.tx.us/opinions/Opinion.asp?OpinionID=15959.
6. Prior to the hearing in January 2007, Hidalgo County amended its subdivision rules to
address qualified subdivisions for purposes of chapter 92. Although SWEPI challenged the
amendments in the district court, SWEPI does not challenge them on appeal. 
7. Section 92.003 addresses who may create a qualified subdivision, limiting creation of
a subdivision to "the surface owners of a tract of land." See Tex. Nat. Res. Code Ann. § 92.003
(West 2001).
8. Prior to the approval of the final orders here, the Commission simultaneously had approved
applications for contiguous qualified subdivisions that exceeded 640 acres combined. See Texas
Railroad Comm'n, Application of Affiliate Crown Development, Ltd. to Consider Approval of a
Qualified Subdivision Pursuant to Statewide Rule 76 for a 407.40 Acre Tract Subdivision in
Montgomery County, Texas, Docket No. XX-XXXXXXX (January 24, 2006) (final order granting
application); Texas Railroad Comm'n, Application of Affiliate Crown Development, Ltd. to Consider
Approval of a Qualified Subdivision Pursuant to Statewide Rule 76 for a 535 Acre Tract Subdivision
in Montgomery County, Texas, Docket No. XX-XXXXXXX (January 24, 2006) (final order granting
application).
9. The legislature also amended section 92.002(3) by requiring the designation of two or more
acres as an operations site for each separate 80 acres within a qualified subdivision and by allowing
qualified subdivisions on barrier islands. See Act of June 11, 1987, 70th Leg., R.S., ch. 274, § 1,
1987 Tex. Gen. Laws 1616, 1616. Prior to the amendment, a qualified subdivision had to contain
two or more operations sites within the 160 acres. See id.
10. For example, prior to the 1987 amendment, a developer with two 640 acre tracts would
have to file and pursue eight qualified subdivision applications with the Commission, increasing the
expense for the applicant and any contestants and risk to the applicant that one application will fail
and jeopardize the entire project. See id.
11. SWEPI does not challenge the hearing examiners' conclusion of law number 4 that was
adopted by the Commission in its final orders. The hearing examiners concluded: "Approval of
each of the applications in these dockets will ensure that the mineral resources of each of the
qualified subdivisions are fully and effectively exploited and developed."
12. SWEPI contends that chapter 92 should be strictly construed because it deprives SWEPI
of its common law right to use as much of the surface as reasonably necessary in order to develop
the minerals. SWEPI urges that a larger subdivision more severely limits oil and gas operations
because there is a larger area that cannot be reached. If a statute "deprives a person of a common
law right, the statute will be strictly construed in the sense that it will not be extended beyond its
plain meaning or applied to cases not clearly within its purview." Satterfield v. Satterfield,
448 S.W.2d 456, 459 (Tex. 1969). Given our conclusion that the plain language of the statute
supports the Commission's interpretation, it follows that the interpretation does not extend the
statute "beyond its plain meaning." See id. 

13. Without providing additional argument or authorities, SWEPI contends that the
Commission's final orders also are "arbitrary or capricious or characterized by abuse of discretion
or clearly unwarranted exercise of discretion." See Tex. Gov't Code Ann. § 2001.174(2)(F) (West
2008). For the same reasons that we conclude that the Board did not exceed its statutory authority,
we also conclude that the Commission's orders were not arbitrary or capricious or characterized by
abuse of discretion or clearly unwarranted exercise of discretion. See id.
14. The House Committee on Energy in its bill analysis references by way of background that
"cities are expanding out over adjacent farm and ranch land to meet the needs of the people for
residential, commercial, and industrial buildings." House Comm. on Energy, Bill Analysis,
Tex. S.B. 946, 68th Leg., R.S. (1983). The bill analysis from the senate natural resources
committee states in the background section that "bank[s] or other lending institutions are reluctant
to lend construction capital if there is a possibility that the building they finance, such as a
warehouse, might later be demolished by the subsurface mineral owners in order for the minerals to
be brought to the surface." Senate Comm. on Nat. Res., Bill Analysis, Tex. S.B. 946, 68th Leg., R.S.
(1983). The House Research Organization noted that chapter 92 was passed to allow "both
real-estate development and mineral exploration." House Research Organization, Daily Report for
May 20, 1987.
15. Interpreting "industrial use" to include landfill operations is consistent with traditional
zoning concepts of "industrial use districts." See Robert M. Anderson, 2 American Law of Zoning
3d § 9.44 (1986) ("Industrial districts traditionally have been the receptacle into which all uses are
placed after those worthy of protection have been provided for. Not infrequently these zones have
been denominated 'unrestricted,'. . ."); Patrick J. Rohan, 7 Zoning and Land Use Controls § 39.06
(2009) ("Traditional zoning schemes place industrial uses at the bottom of the hierarchy of uses. 
Thus, beginning with what is considered the highest, most sensitive use of property, the single-family
detached home, zoning codes typically move down through high density residential uses and
commercial uses before they reach the lowest classification, industrial use."). 
16. A surface owner also may create a qualified subdivision on a tract of land on a barrier
island. See Tex. Nat. Res. Code Ann. § 92.002(3)(A) (West 2001).
17. Prior to Eyhorn's applications, the Commission had considered and approved a qualified
subdivision application for landfill operations. See Texas Railroad Comm'n, Application of E&D
Waste Systems, Inc. for Approval of a Qualified Subdivision Pursuant to Statewide Rule 76 for a
99.9733 Acre Tract of Land in Abstracts Nos. 601 and 607, Galveston County, Texas, Docket No.
3-84,416 (Oil & Gas Div'n August 19, 1985) (final application approving qualified subdivision for
use as a landfill). 
18. SWEPI's reliance on El Paso Hospital District v. Texas Health and Human Services
Commission, 247 S.W.3d 709 (Tex. 2008), and City Public Service Board of San Antonio v. Public
Utility Commission, 96 S.W.3d 355 (Tex. App.--Austin 2002, no pet.), is similarly misplaced. 
Neither case addressed the issue raised by the Commission here--whether asserted declaratory
claims were redundant of the issues and available remedies in a parallel administrative appeal. In
El Paso Hospital, the issue was whether the agency's method of calculating certain rates was an
agency rule and, if so, if it was valid. 247 S.W.3d at 711. And in City Public Service, this Court
addressed the direct appeal provisions of the public utilities act. 96 S.W.3d at 356.
19. Eyhorn initially filed a proposed subdivision plat, a metes and bounds description and use
restrictions, and a "map of topograph and drainage" with Hidalgo County for both subdivisions. The
revised plats that were approved by the Commission consist of one page per subdivision depicting
the location of the oil and gas operations sites and easements.